186 P.3d 348 (2008)
Andrew James CLAYTON, Respondent,
v.
Mary Kay WILSON, Appellant, and
Douglas Mecklem Wilson, Defendant.
No. 57891-0-I.
Court of Appeals of Washington, Division 1.
June 16, 2008.
*349 Dennis J. McGlothlin, Olympic Law Group, Seattle, Wa, for Appellant.
Kathryn Goater, James D. Hailey, Schroeter Goldmark & Bender, Seattle, Wa, for Respondent.
BECKER, J.
¶ 1 Over a period of years, Douglas Wilson sexually abused a neighbor boy who was doing yard work on property belonging to the Wilson marital community. When Mr. Wilson's criminal activity came to light, he agreed to a divorce settlement with his wife whereby she received almost all the community assets. The abuse victim filed suit against both of the Wilsons. Because Mr. Wilson used his position as manager of the community property to obtain access to his victim, the trial court did not err in imposing liability on Mrs. Wilson to the extent of the former community property. After rightly concluding the property settlement agreement was a fraudulent transfer, the trial court appropriately protected the plaintiff's ability to collect the judgment by voiding the transfer and enjoining the Wilsons from disposing of the assets. We reverse and modify in part, and affirm the remainder of the trial court's decision.

FACTS
¶ 2 According to findings entered by the trial court after a bench trial, appellant Mary Kay Wilson had been married to her husband Douglas Wilson for 37 years when she found out that he had been sexually molesting a young neighbor boy named Andrew Clayton. Andrew and his family moved into a rental home owned by the Wilsons when Andrew was eight years old. When Andrew was between nine and ten years old, Mr. Wilson began sexually assaulting him. He began by giving Andrew back rubs over his clothing after Andrew had performed yard work. These backrubs gradually progressed to fondling, masturbation, and fellatio.
¶ 3 The sexual assaults occurred on more than 40 separate occasions, ending when Andrew was 15 years old and his family moved away. The assaults occurred in conjunction with Andrew's employment doing yard work for the Wilsons. After Andrew would complete his assigned yard work, Mr. Wilson would take him inside, sexually assault him, and then pay him for the yard work.
¶ 4 Andrew did not tell anyone about the molestation until he was 18 years old. His disclosure led to the arrest of Mr. Wilson on December 7, 2002. Mr. Wilson admitted to police that he had sexually assaulted Andrew for several years. When Mrs. Wilson came to visit her husband while he was in jail, he told her there were other victims besides Andrew.
¶ 5 Mr. Wilson was released from custody on December 9, 2002. Mrs. Wilson contacted a divorce attorney on December 10. Mr. Wilson agreed that his wife would get all of their assets. The Wilsons met with the attorney on December 11 to discuss dissolving *350 the marriage and dividing the property. Working through the weekend, the attorney prepared a property agreement dividing the property as directed by the Wilsons. Under the terms of the agreement, Mrs. Wilson would receive $1,639,501, representing about 90.5 percent of the property. Mrs. Wilson signed the property settlement agreement on December 19 and Mr. Wilson signed on December 20. Their divorce became final in March 2003.
¶ 6 The State charged Mr. Wilson with child molestation and rape of a child. He pled guilty as charged on November 5, 2003 and was sentenced to 130 months in prison.
¶ 7 Andrew filed this civil lawsuit on June 17, 2004. After a bench trial, the court concluded that both Mr. Wilson and the marital community were liable to Andrew for the sexual abuse perpetrated by Mr. Wilson. The court awarded Andrew $1,200,000 in damages for emotional distress, $200,000 for future lost wages, $4,024.50 for past medical expenses, and $14,200 for future medical expenses, for a total of approximately $1.4 million. On February 23, 2006, the court entered judgment for Andrew in the total of those amounts against Mr. Wilson individually, and also against Mrs. Wilson as a joint and several obligation with Mr. Wilson. The court enjoined the Wilsons from further disposing of any property that had formerly been community property without court approval, pending an accounting to identify any separate funds of Mr. Clayton available to satisfy the judgment.
¶ 8 The court also concluded that the transfer of property from husband to wife that occurred by means of the property settlement agreement was fraudulent. The Wilsons had not sustained their burden of proving that the transfer was made in good faith and Mr. Wilson did not receive reasonably equivalent value in exchange for the assets. The court imposed the statutory remedy of voiding the transfer and enjoined the Wilsons from disposing or encumbering any former community property distributed by their agreement unless approved by the court.
¶ 9 Mrs. Wilson appeals.

COMMUNITY LIABILITY
¶ 10 Mrs. Wilson contends the court erred in holding the marital community liable for the sexual assaults. A key question is whether the trial court properly characterized the sexual molestation as an act done in the course of managing community business.
¶ 11 The trial court's determination of this issue rested on its finding that the sexual assaults occurred in the course of Andrew doing yard work for the Wilsons:
Douglas Wilson committed the sexual assaults of Andrew Clayton in the course of managing the community property of the Wilsons. Mr. Wilson gained access to Andrew by first employing him to do yard work on the property owned by the Wilsons. Andrew was molested after performing his assignments. Andrew testified that every time he was molested the sexual assault was preceded by doing yard work for which he was paid, be it on the Kenmore, Monroe, or Seabeck property. The court finds Andrew's testimony credible, and finds Mr. Wilson's testimony denying the molestation incidents always followed the performance of yard work to be not credible. Andrew was paid with community funds, and the work he did benefited the community. His job included yard work on the rental properties, from which the community received income. Mrs. Wilson knew that Andrew was employed to do yard work on the community property and was being paid with community assets. Mrs. Wilson participated in supervising the minor males who did yard work on the Wilson's property. She also was the chief manager of the family's finances including the community's rental property business.[[1]]
¶ 12 Generally, an appellate court reviews a trial court's findings to determine if the findings are supported by substantial evidence. Nichols Hills Bank v. McCool, 104 Wash.2d 78, 82, 701 P.2d 1114 (1985). There is substantial evidence to support the finding that each time the abuse occurred, it was after Andrew had been doing yard work *351 for the Wilsons. The issue raised by Mrs. Wilson is whether under these circumstances it is correct to say that Mr. Wilson committed the sexual assaults in the course of managing the community property. This is a legal issue that we will review de novo.
¶ 13 The trial court relied on LaFramboise v. Schmidt, 42 Wash.2d 198, 254 P.2d 485 (1953). Mrs. Wilson contends LaFramboise is not applicable and that the assaults on Andrew were intentional torts committed by her husband for which he alone is liable. We conclude LaFramboise, the Washington precedent with the most analogous facts, is still good law and supports the imposition of community liability.
¶ 14 In LaFramboise, the parents of six year old Beverly LaFramboise left her in the care of the Schmidt family for six months while they were traveling in Alaska. The Schmidts were paid to take care of Beverly. Louis Schmidt subjected Beverly to indecent liberties and was criminally convicted of this crime. LaFramboise, 42 Wash.2d at 199, 254 P.2d 485. Beverly's mother brought a civil action against Louis Schmidt for damages caused by the sexual abuse. A jury returned a verdict in favor of Beverly LaFramboise. Judgment in the amount of $7,500 was entered against the Schmidt marital community.
¶ 15 The Schmidts appealed. They contended the trial court erred in instructing the jury on community liability. The jury instruction read as follows:
You are instructed that the defendant and his wife, Blanche Schmidt, constitute a marital community.
If you find by a preponderance of the evidence that said community undertook to care for Beverly LaFramboise and received a consideration therefor, and if you further find by a preponderance of the evidence that the defendant, Louis Schmidt, during the period while said child was in the care and custody of said defendant and of the said community, did take indecent liberties with said child, then the community would be liable therefor.
LaFramboise, 42 Wash.2d at 199, 254 P.2d 485. The Schmidts claimed there was no basis for community liability because the evidence showed that Louis Schmidt committed the abuse on his own and the abuse was secret and concealed.
¶ 16 The Supreme Court disagreed. A marital community is liable for the torts of the husband if the act constituting the wrong "either (1) results or is intended to result in a benefit to the community or (2) is committed in the prosecution of the business of the community." LaFramboise, 42 Wash.2d at 200, 254 P.2d 485. The Schmidt marital community was responsible for Beverly's care and the criminal acts were a part of the care the child received. "They were done in the course of the community's business, and the community is, therefore, liable for them." LaFramboise, 42 Wash.2d at 200, 254 P.2d 485.
¶ 17 Mrs. Wilson suggests that LaFramboise has been undermined or displaced by deElche v. Jacobsen, 95 Wash.2d 237, 242, 622 P.2d 835 (1980). In that case Mr. Jacobsen, a married man, forcibly raped Ms. deElche during a social event on a sailboat owned by Ms. deElche's ex-husband. Ms. deElche brought an action for damages and was awarded a judgment against Mr. Jacobsen separately. Mr. Jacobsen did not have any separate property to satisfy the judgment. Ms. deElche appealed and asked the Supreme Court to overturn the rule which immunized the Jacobsens' community property from collection on the judgment for the separate tort of Mr. Jacobsen.
¶ 18 The Supreme Court recognized that courts were straining to find facts that would connect a tort with the marital community of the tortfeasing spouse so as to justify imposing community liability and allowing the plaintiff to be made whole. The rule that made a plaintiff's ability to recover depend upon whether the tort was classified as community or separate was producing "illogical, inconsistent and unjust results":
When logically and equitably it was the tortfeasor alone who should bear the costs of his actions, the courts have been given only two choices  either impose one-half of the liability upon the property of the nontortfeasing spouse, even though that spouse had nothing to do with the tort, or *352 force the innocent victim to bear all damages produced by an acknowledged tortfeasor if that tortfeasor, even though solvent, had only community property. The tortfeasor could hardly lose; absent the ownership of separate property he or she could be held liable to pay either only half the judgment or nothing at all.
deElche, 95 Wash.2d at 242, 622 P.2d 835. The court mentions LaFramboise as an example of the tendency to make the marital community liable rather than leave an innocent plaintiff with no recovery:
Other cases which found community liability upon tenuous contacts with the community . . . include LaFramboise v. Schmidt, 42 Wash.2d 198, 254 P.2d 485 (1953), where the husband committed indecent liberties upon a child staying in their home. . . . In the cited cases the only way plaintiff could recover was a determination that the community was liable.
deElche, 95 Wash.2d at 242, 622 P.2d 835.
¶ 19 To enable a plaintiff to recover from community property even for a separate tort, the court adopted a new rule. If a plaintiff obtained judgment against one spouse for which there was no community liability, and that spouse's separate property was insufficient to satisfy the judgment, the plaintiff could go after the tortfeasor's half interest in community personal property. deElche, 95 Wash.2d at 246, 622 P.2d 835. However, torts committed in the management of community business or for the benefit of the community "will remain community torts with the community and the tortfeasor separately liable." deElche, 95 Wash.2d at 245, 622 P.2d 835.[2]
¶ 20 The court commented in deElche that as a result of its holding, it was possible that some torts which in the past had been classified as community, based on emotional factors or overtones, would now be properly characterized as separate. deElche, 95 Wash.2d at 245, 622 P.2d 835. Mrs. Wilson points out that Justice Finley identified LaFramboise as a case with emotional overtones when he dissented in Smith v. Retallick, 48 Wash.2d 360, 365, 293 P.2d 745 (1956) (Finley, J., dissenting), a dissent which was influential in deElche. See deElche, 95 Wash.2d at 245, 622 P.2d 835. The deElche court refers to LaFramboise as an opinion that found community liability upon "tenuous contacts" with the community. deElche, 95 Wash.2d at 242, 622 P.2d 835. Based on these references, Mrs. Wilson describes LaFramboise as "antiquated and highly criticized."[3] That is an exaggeration. In Smith, after all, Justice Finley was arguing in favor of making the marital community liable to the plaintiff for at least half the judgment on the basis that no principled distinction could be found between the facts in that case and the facts in community liability cases like LaFramboise. Smith v. Retallick, 48 Wash.2d at 368, 293 P.2d 745 (Finley, J., dissenting). And the deElche court, despite its use of the word "tenuous" to describe the connection between the tort and the community in LaFramboise, nevertheless preserved community liability for torts "which can properly be said to be done in the management of community business." deElche, 95 Wash.2d at 245, 622 P.2d 835.
¶ 21 LaFramboise may be old, but its stability as a precedent after deElche has been affirmed by no less a commentator than Harry M. Cross. Professor Cross explored the probable impact of the deElche decision in a 1986 law review article:
The holding obviously calls for drawing the line between community and separate torts in a new location to put more incidents on the separate side of the line. Since the new location is uncertain, however, and all real and personal community property must respond to a community tort, rather than only half of the community personal property to a separate tort under deElche, plaintiffs will still seek community liability even though the supporting argument may be tenuous. The previous cases in which *353 community liability was found are therefore of continuing interest though deElche may have undermined the authority of some of them.[[4]]
The Cross article discusses LaFramboise in connection with "management of community business" as a recognized basis for community tort liability:
There obviously would be some difficulty in saying that the husband was managing community property at the time or that the act was intended to benefit the marital community, although the employment to care for the child was so intended. In this area the concept of "business" is not narrow and the looseness of the test which the cases developed is better identified as requiring that the spouse be engaged in some community errand, affair, or business at the time of the tort to establish community liability.[[5]]
Professor Cross concluded that LaFramboise would likely be decided the same way even in light of the change in the law brought about by deElche:

LaFramboise involved indecent liberties taken during the care of a minor child; the reasoning that there was a community enterprise being conducted during which the tort occurred probably leaves the community liability intact.
. . . .
It appears probable then, that deElche stands only for the proposition that a separate tort creditor can reach the tortfeasor spouse's half interest in community personal property and perhaps in community real property, in those situations involving purely personal wrongs having no conceivable connection with community property or affairs. If this is correct, the distortion of long-standing concepts in Washington community property law is likely to be more apparent than real  and to the author such extraordinary distortion is tolerable given the need for some chance of protection for the tort victim.[[6]]
¶ 22 Here, like in LaFramboise, the tort occurred while the tortfeasor spouse was participating in a community enterprise. Mr. Wilson was personally engaged in managing the community's real property when he took advantage of Andrew's presence as a yard worker. Mrs. Wilson tries to distinguish LaFramboise on the basis that her husband's management of the community property involved paying out community funds to Andrew for his yard work, rather than receiving community funds for caring for a child as was the case in LaFramboise. However, she proposes no reason, and we see none, why the community liability that arises from torts committed in the management of community property or business would be limited to situations where money comes in rather than goes out.
¶ 23 LaFramboise identified agency law, or respondeat superior, as the theoretical basis for placing liability upon the community for torts committed in the management of community business or for its benefit. LaFramboise, 42 Wash.2d at 200, 254 P.2d 485. Mrs. Wilson contends that under agency law there can be no community liability for Mr. Wilson's intentional tort because his assaults upon Andrew were outside the scope of his authority. See Kuehn v. White, 24 Wash. App. 274, 277, 600 P.2d 679 (1979) (under agency law, when a servant steps aside from the master's business in order to effect some purpose of his own, the master is not liable). Her analysis is flawed because it assumes that the marital community was, like a corporation, a separate and distinct "master" to whom Mr. Wilson was merely a "servant". In reality, as deElche explains, a marital community does not have the status of a corporation and in fact "does not exist as a separate and distinct juristic entity." deElche, 95 Wash.2d at 243, 622 P.2d 835. Mr. Wilson was managing the community property on behalf of the marital enterprise consisting of himself and his wife. Any purpose he had while managing that property was the purpose of the "master".
*354 ¶ 24 Mrs. Wilson attempts to draw an analogy to Francom v. Costco Wholesale Corp., 98 Wash.App. 845, 991 P.2d 1182 (2000). In that case, a woman employed by Costco alleged that she had been sexually harassed at work by Mr. Hathaway, a non-managerial coworker. Primarily, the decision gave the victim the right to proceed against Costco. And the court assumed that the victim could also make Hathaway individually liable for his conduct. But the victim also wished to proceed against the Hathaway marital community, on the theory that since Hathaway's acts of harassment were committed at work, they were done in the course of managing community property or for the benefit of the community. Francom, 98 Wash.App. at 868, 991 P.2d 1182. The court rejected this theory on the ground that sexual harassment "certainly was not within the scope of Mr. Hathaway's employment" and affirmed the dismissal of this claim. Francom, 98 Wash. App. at 869, 991 P.2d 1182. Mrs. Wilson argues that her husband's motives, like Hathaway's, were purely personal and therefore his acts of abuse were outside the scope of his "employment" by the community.
¶ 25 The scope of employment addressed in Francom was the scope of Hathaway's employment by Costco. In directing the yard work for houses owned by his marital community, Mr. Wilson was managing property belonging to the community. In relationship to his marital community, Mr. Wilson was not a mere employee; he was a manager. If comparisons can be made to employment cases, the appropriate analogy is to the rule that where an owner, manager, partner or corporate officer personally participates in workplace harassment, liability for harassment is imputed to the employer as a matter of law. See Glasgow v. Georgia-Pacific Corp., 103 Wash.2d 401, 407, 693 P.2d 708 (1985); Francom, 98 Wash.App. at 853, 991 P.2d 1182. Because Mr. Wilson was one of the "owners" and "managers" of the Wilson marital community, torts that he committed while engaged in management of community business are automatically imputed to the community whether they were negligent or intentional, open or concealed, and whether his wife knew about them or not.
¶ 26 LaFramboise is the controlling case here, not Francom. It would be inconsistent with LaFramboise to read Francom as holding that a marital community can never be liable for intentional torts secretly committed by one spouse for personal gratification. Because Mr. Wilson sexually abused Andrew while overseeing yard work on behalf of the community, the trial court correctly concluded that the marital community is liable.
¶ 27 The trial court's Conclusion of Law 8 stated that the judgment for over $1.4 million should be entered against Mr. Wilson individually, and against Mrs. Wilson as a joint and several obligation with Mr. Wilson's judgment. The judgment was entered in accordance with this conclusion. Mrs. Wilson expresses concern that the judgment, written in this way, will make any separate property that she owns reachable by creditors. Such a result was not intended by the trial court; the only liability that Mrs. Wilson has is as a member of the former marital community.[7] But that is indeed a substantial liability. Because the former marital community is liable along with Mr. Wilson, the community property of the marriage is subject to recovery along with any separate property held by Mr. Wilson.
¶ 28 The record does not contain evidence of any separate property owned by Mrs. Wilson before the property settlement agreement and dissolution. She does not specify any separate assets that she fears will be unfairly exposed to attack. Thus her concern about the wording of the judgment appears to be technical rather than substantive. Nevertheless, we conclude that Conclusion of Law 8 and the judgment should be amended to clarify that Mrs. Wilson is liable to Andrew to the extent of the former community property. To that extent, it was appropriate to make her jointly and severally liable with Mr. Wilson.

FRAUDULENT TRANSFER
¶ 29 The trial court found that the hastily prepared property settlement agreement *355 that transferred the bulk of the Wilsons' community assets to Mrs. Wilson was a fraudulent transfer as to Andrew, a present and future creditor of Mr. Wilson and the community. The court ruled that the transaction amounted to actual and constructive fraud under the common law and violated Washington's Uniform Fraudulent Transfer Act (UFTA), Chapter 19.40 RCW. Mrs. Wilson attacks this determination on all fronts and seeks to have the fraudulent transfer claim dismissed. However, the issues raised by the claim are primarily factual in nature, and the findings underlying the trial court's analysis are undisputed.
¶ 30 The Wilsons executed their property settlement agreement two weeks after Mr. Wilson was arrested for sexually abusing Andrew Clayton. They knew that Andrew and perhaps other victims of Mr. Wilson's past child sex abuse had claims for damages. Mrs. Wilson specifically discussed with the attorney the possibility that Andrew would be making a claim.
¶ 31 The agreement allocated to Mrs. Wilson assets valued at $1,639,501; the value of Mr. Wilson's share was $171,411. The Wilsons presented two expert witnesses who testified that they believed the division of assets was fair. But the court found the opinion of family law attorney Mabry DuBuys, who testified on behalf of Andrew, to be more credible and realistic. Ms. DuBuys, who has handled over 750 dissolution cases with total assets at or exceeding $2 million, testified that the property division was "very skewed and not fair" and the speed at which the Wilsons divided the property was "incredibly quick."[8] The court found the division of property was "not within the range of likely distribution" that a court would have ordered had the dissolution been tried.[9] It was undisputed that as a result of the property settlement agreement, Mr. Wilson became insolvent.
¶ 32 The trial court imposed upon the Wilsons the burden of proving their good faith, relying on a statute that applies generally to transactions between spouses: "In every case, where any question arises as to the good faith of any transaction between husband and wife, whether a transaction between them directly or by intervention of third person or persons, the burden of proof shall be upon the party asserting the good faith." RCW 26.16.210. The court concluded the Wilsons did not prove the good faith of the conveyances set forth in the property settlement.
¶ 33 Mrs. Wilson claims that RCW 26.16.210 does not apply because the property settlement agreement was not a transaction between husband and wife. She reasons that the property settlement agreement "merged" into the dissolution decree and therefore she was not married when the settlement went into effect. The plain language of the agreement defeats Mrs. Wilson's argument: "It is understood and agreed by the parties that this contract shall be final and binding upon execution by both parties whether or not a Decree of Dissolution is obtained."[10] By its terms, the property settlement agreement was an independent contract effective when signed. Both Wilsons signed it while they were still married. The Wilsons' failure to prove the good faith of their transaction supports the trial court's conclusion that Mr. Wilson transferred property with actual intent to defraud. See RCW 19.40.41(a)(1).
¶ 34 Even if there were no support for the finding of actual intent to defraud, the trial court also ruled that the transfer was constructively fraudulent because Mr. Wilson made the transfer without receiving "reasonably equivalent value" in exchange for it. RCW 19.40.041(a)(2); RCW 19.40.051(a). Mrs. Wilson contends her husband did receive reasonably equivalent value because she waived any right to maintenance. However, the court's undisputed finding was that the distribution of property was highly skewed in favor of Mrs. Wilson. It would have been unrealistic to look at her share as a fair exchange for her waiver of maintenance, considering that Mr. Wilson's future *356 earning power would be so diminished by his incarceration that he would be unable to pay maintenance. The findings support the conclusion that Mr. Wilson did not receive reasonably equivalent value for the transfer.
¶ 35 The court also correctly concluded that Andrew established a "common law" claim of fraudulent transfer between the spouses based on Davison v. Hewitt, 6 Wash.2d 131, 135-36, 106 P.2d 733 (1940). In that case a husband transferred shares of stock to his wife for no consideration at a time when he was already indebted. The trial court ordered that the shares issued to the wife be sold to satisfy the debt. Upon the wife's appeal, the Supreme Court affirmed:
Under our community property law (Rem.Rev.Stat., § 6890 et seq.), the husband or wife may give or convey his or her separate property to the other spouse, provided he or she is free from debts and liabilities or, at the time of the making of the gift or conveyance, has ample means readily and conveniently accessible to his or her creditors and to the ordinary process used in the collection of debts. . . .
Irrespective of the motive actuating the transfers by the husband of his separate property to his wife, it is clear that, at the time the transfers were made to appellant, her husband was insolvent; hence, the act of transferring the property is conclusive evidence of fraud, and the intent is presumed from the act. The burden of proof was not met by appellant.
Davison, 6 Wash.2d at 135-36, 106 P.2d 733 (emphasis added).
¶ 36 The UFTA provides that common law principles, including the law related to fraud, supplement the UFTA unless displaced by its provisions. RCW 19.40.902. Mrs. Wilson argues that common law fraudulent transfer as exemplified by Davison has been displaced by the UFTA. As there is no specific provision in the UFTA governing transfers between husband and wife, we conclude there has been no displacement and the claim recognized in Davison remains a viable cause of action.
¶ 37 A theme running throughout Mrs. Wilson's defense of the property settlement agreement is that transfers between spouses in contemplation of divorce are simply not susceptible to being deemed fraudulent transfers, because an imbalance in the distribution of property could just as easily reflect one spouse's commendable desire that the other spouse be well taken care of. While cases can indeed be found in which courts have refused to void transfers that occurred between spouses pursuant to divorce  Mrs. Wilson cites several decided by bankruptcy courts  generally this is because the factual prerequisites for a fraudulent transfer are absent, not because the law bars creditors from asking courts to void such transfers. For example, Mrs. Wilson relies on Britt v. Damson, 334 F.2d 896 (9th Cir.1964). But Britt actually confirms that in appropriate circumstances a bankruptcy trustee can use the law of fraudulent transfer to reach former marital property in the hands of the bankrupt's divorced spouse. Britt, 334 F.2d at 902; see also In Re Gipe, 157 B.R. 171, 177 (Bankr.D.Fla.1993).
¶ 38 Mrs. Wilson also cites Jones v. Jones, 56 Wash.2d 328, 333, 353 P.2d 441 (1960). In that case, the trial court found that a husband had fraudulently transferred a wheat farm to his second wife in order to place it beyond the reach of the child support obligations he owed to his first wife. The Supreme Court reversed, but contrary to Mrs. Wilson's suggestion, it was not because of any reluctance to apply the law of fraudulent transfer to a conveyance between spouses. Rather, it was because the evidence and the timing of events could only support a finding that the transfer was made in good faith.
¶ 39 Because Andrew was a known creditor at the time the Wilsons agreed to divide their property, Mr. Wilson did not receive reasonably equivalent value, the division rendered Mr. Wilson insolvent, and the Wilsons did not prove that the transfer was made in good faith, the trial court's conclusions on the various theories of fraudulent transfer are adequately supported. The remedy of voiding the transfer and freezing the assets was properly imposed.

*357 DAMAGES
¶ 40 Pretrial, Mrs. Wilson moved to bifurcate the trial to have the personal injury claim be heard separately from the claims of fraudulent transfer, so that the court would not be aware of the extent of the Wilsons' assets when assessing how much to award Andrew for his emotional damages. She assigns error to the court's denial of this request.
¶ 41 The ruling is discretionary. Brown v. General Motors Corp., 67 Wash.2d 278, 282, 407 P.2d 461 (1965). There was no factor of convenience or prejudice compelling bifurcation. This was a bench trial. There were good reasons of judicial economy to try both matters together. And even if the sex abuse claim had been tried first, it would have been virtually impossible to conceal the fact that the Wilsons owned property and were relatively prosperous. We find no abuse of discretion.
¶ 42 Mrs. Wilson contends the damage awards for emotional harm ($1.2 million) and future wage loss ($200,000) were excessive, warranting a new trial. This argument fails. Andrew was subjected to sexual abuse for six years as a young boy and the damage has permeated every aspect of his life. Although he presently works at an entry-level job, there was substantial evidence that even with successful counseling he will be unlikely to advance because he will continue to have difficulty concentrating and working without supervision. The damage awards were within the range supported by the evidence and accordingly will not be disturbed.
¶ 43 The case is remanded to the trial court for the sole purpose of amending the conclusions and judgment to clarify that Mrs. Wilson is liable to Andrew to the extent of the former community property. In all other respects the judgment is affirmed.
WE CONCUR: GROSSE, J. and BAKER, J. Pro Tem.
NOTES
[1] Clerk's Papers at 898-99 (Finding of fact 24).
[2] The court has since extended deElche to make a judgment against a tortfeasor spouse collectable from the tortfeasor's interest in community real property as well if "the tortfeasor's separate property and share of community personal property are insufficient to satisfy the judgment." Keene v. Edie, 131 Wash.2d 822, 835, 935 P.2d 588 (1997).
[3] Br. of Appellant at 21 n. 192.
[4] Harry M. Cross, The Community Property Law in Washington (Revised 1985), 61 Wash. L.Rev. 13, 132 (1986).
[5] Cross, 61 Wash. L.Rev. at 137.
[6] Cross, 61 Wash. L.Rev. at 139, 140.
[7] Clerk's Papers at 903 (Conclusion of Law 4).
[8] Clerk's Papers at 901 (Finding of fact 34).
[9] Clerk's Papers at 907 (Conclusion of law 23).
[10] Plaintiff's Exhibit 13 at 3 (Property Settlement Agreement).