227 P.3d 278 (2010)
168 Wash.2d 57
Andrew James CLAYTON, Respondent,
v.
Douglas Mecklem WILSON, Defendant,
Mary Kay Wilson, Defendant/petitioner.
No. 81920-3.
Supreme Court of Washington, En Banc.
Argued October 22, 2009.
Decided January 21, 2010.
*279 Dennis John McGlothin, Olympic Law Group, PLLP, Seattle, WA, for Petitioner.
James D. Hailey, Kathryn Goater, Schroeter Goldmark & Bender, Seattle, WA, for Respondent.
SANDERS, J.
¶ 1 For a number of years Douglas Wilson sexually abused Andrew Clayton, a young boy hired to help with yard work on properties owned by the Wilsons' marital community. Clayton eventually notified police of the abuse, which led to Mr. Wilson's arrest. When Mr. Wilson was released from jail but still awaiting trial, the Wilsons executed a property agreement giving Mary Kay Wilson more than 90 percent of the community assets.
¶ 2 Clayton filed a tort action against the Wilsons. After a bench trial the King County Superior Court found the marital community liable and awarded damages against Mr. Wilson separately, as well as jointly and severally against Ms. Wilson. The court also voided the property transfer after finding it fraudulent. Ms. Wilson appealed and the Court of Appeals affirmed. Clayton v. Wilson, 145 Wash.App. 86, 186 P.3d 348 (2008), review granted, 165 Wash.2d 1019, 203 P.3d 378 (2009).
¶ 3 We likewise affirm.

FACTS
¶ 4 When Andrew Clayton was eight or nine years old, his family rented a house owned by Douglas and Mary Kay Wilson. The Wilsons hired Clayton to perform yard work around the rental property and other properties owned by the Wilsons. Almost immediately Mr. Wilson began sexually abusing Clayton when he completed the day's work. From the beginning Mr. Wilson linked the abuse to the yard work. Mr. Wilson started giving Clayton clothed back massages under the pretense of relieving sore muscles. Those massages gradually progressed into shirtless back massages, nude full-body massages, genital fondling, masturbation, and oral sex. All told, Mr. Wilson abused Clayton more than 40 times between Clayton's 9th and 15th or 16th year of age. Mr. Wilson did not pay Clayton until that day's sexual abuse was finished. Mr. Wilson used community assets to pay Clayton, his employee and tenant.
¶ 5 When he turned 18, Clayton described the sexual abuse to his mother, who notified police. Police arrested Mr. Wilson on December 5, 2002. Ms. Wilson visited him in jail on December 7, 2002, at which point Mr. Wilson told her he had victimized other boys. On December 11two days after Mr. Wilson *280 was released from jail and awaiting chargesthe Wilsons met with an attorney to seek marital dissolution and property distribution. The Wilsons knew Clayton and other victims could file lawsuits against them. On December 19 and 20 the Wilsons executed a property settlement agreement transferring $1,639,501, which totaled 90.5 percent of community assets, to Ms. Wilson. The property agreement went into effect upon execution, not upon dissolution of the marriage. Ms. Wilson permitted Mr. Wilson to live at the couple's Seabeck property rent free while awaiting sentencing. The Wilsons dissolved their marriage on March 31, 2003.
¶ 6 In June 2004 Clayton filed suit against the Wilsons. After a bench trial the King County Superior Court awarded Clayton approximately $1.4 million ($1.2 million for emotional distress, $200,000 for future lost wages, $4,024.50 for past medical expenses, and $14,200 for future medical costs). The trial court also found the marital community liable and entered judgment against Mr. Wilson separately and against Ms. Wilson as a jointly and severally liable judgment debtor. The court also enjoined the Wilsons from disposing of any former community property without court approval until an accounting was complete as to Mr. Wilson's separate property.
¶ 7 Additionally the trial court found the Wilsons' property agreement fraudulent on four separate grounds, and voided it. Ms. Wilson appealed to the Court of Appeals, which unanimously affirmed.[1] We granted review to decide (1) whether the Wilsons' marital community is liable for Mr. Wilson's intentional torts, (2) whether the property transfer between the Wilsons is void as fraudulent, and (3) whether Clayton proved future lost wages.

ANALYSIS
¶ 8 Whether a marital community is liable for the intentional tort of one of its members and whether a property transfer is fraudulent are mixed questions of law and fact. We review mixed questions of law and fact de novo. Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 329-30, 646 P.2d 113 (1982). We review conclusions of law under the same de novo standard. Sunnyside Valley Irr. Dist. v. Dickie, 149 Wash.2d 873, 880-81, 73 P.3d 369 (2003). The trial court determined Clayton's future lost wages in findings of fact 18-22 (Clerk's Papers (CP) at 848-50). We review findings of fact under a substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. Sunnyside Valley Irr. Dist., 149 Wash.2d at 880-81, 73 P.3d 369.

I. Marital community liability
¶ 9 Whether the Wilsons' marital community is liable for Mr. Wilson's intentional torts hinges on whether the sexual abuse occurred in the course of managing community business. In LaFramboise v. Schmidt, 42 Wash.2d 198, 254 P.2d 485 (1953), we held a marital community liable for indecent liberties committed by the husband against a young girl entrusted to the community's care. The parents of six-year-old Beverly LaFramboise left her in the care of Louis and Blanche Schmidt while her parents toured Alaska. The parents paid the Schmidts $35 per week to care for Beverly. At trial, a jury rendered a verdict against the marital community based on a jury instruction that stated the marital community would be liable if the jury found the indecent liberties occurred "`during the period while said child was in the care and custody of said defendant and of the said community.'" Id. at 199, 254 P.2d 485 (quoting jury instructions).
¶ 10 The Schmidts claimed the community could not be liable because Louis committed the act individually and because Louis acted outside the scope of his employment (i.e., no respondeat superior). Id. We rejected defendants' claims holding, "the community is not liable for the torts of the husband, unless the act constituting the wrong either (1) results or is intended to result in a benefit to the community or (2) is committed in the *281 prosecution of the business of the community." Id. at 200, 254 P.2d 485 (emphasis added). We reasoned because Louis committed the intentional tort while conducting community business, the community bore responsibility. Id.
¶ 11 Ms. Wilson claims deElche v. Jacobsen, 95 Wash.2d 237, 622 P.2d 835 (1980), modified our LaFramboise two-pronged approach to community liability. In deElche a married man raped a woman who was sleeping on a sailboat. The victim sued the husband-rapist and won damages, but the husband-rapist had no separate assets with which to satisfy the judgment. We held where a plaintiff wins a judgment against an insolvent tortfeasor spouse for a separate tort (i.e., not committed during community business), the plaintiff may recover from the tortfeasor's one-half interest in the marital community's personal property. Id. at 246, 622 P.2d 835.[2] We embraced the rule in deElche to provide courts a clean, reasonable, and fair means of giving plaintiffs relief against insolvent separate tortfeasors, instead of condoning the preexisting practice among lower courts of stretching community liability to apply to situations where it was questionable. See deElche, 95 Wash.2d at 242, 622 P.2d 835. For torts involving management of community business, however, we left our LaFramboise approach undisturbed. "Torts which can properly be said to be done in the management of community business, or for the benefit of the community, will remain community torts with the community and the tortfeasor separately liable." Id. at 245, 622 P.2d 835 (emphasis added). As Professor Cross pointed out in his influential article, "the reasoning that there was a community enterprise being conducted [in LaFramboise] during which the tort occurred probably leaves the community liability intact." Harry M. Cross, The Community Property Law (Revised 1985), 61 WASH. L.REV. 13, 139 (1986).
¶ 12 Unfortunately we generated confusion by criticizing LaFramboise as a case that found community liability "upon tenuous contacts with the community" and based on "`emotional factors or overtones.'" deElche, 95 Wash.2d at 242, 245, 622 P.2d 835 (quoting Smith v. Retallick, 48 Wash.2d 360, 365, 293 P.2d 745 (1956)). Ms. Wilson claims these criticisms led to "misguided reliance" on LaFramboise by the Court of Appeals. Pet. for Review at 10 (emphasis removed).
¶ 13 Even though we decided LaFramboise more than a half-century agonot to mention that we cast stones at it in deElcheLaFramboise's approach to community liability remains good law. The deElche case altered our approach to liability only for separate torts, not community torts. As Professor Cross stated:
It appears probable then, that deElche stands only for the proposition that a separate tort creditor can reach the tortfeasor spouse's half interest in community personal property and perhaps in community real property, in those situations involving purely personal wrongs having no conceivable connection with community property or affairs.
Cross, supra, 61 WASH. L.REV. at 140 (emphasis added). Of the cases in our jurisprudence, LaFramboise most closely parallels the facts in the instant matter. It controls here.
¶ 14 The Wilsons' marital community is liable for Mr. Wilson's intentional torts under LaFramboise's second prong. From the beginning Mr. Wilson linked Clayton's sexual abuse with management of community business. We broadly construe LaFramboise's second prong. According to Professor Cross:
There obviously would be some difficulty in saying that the husband was managing community property at the time or that [child molestation] was intended to benefit the marital community, although the employment to care for the child was so intended. In this area the concept of "business" is not narrow and the looseness of the test which the cases developed is better identified as requiring that the spouse be engaged in some community errand, affair, *282 or business at the time of the tort to establish community liability.

Id. at 137 (emphasis added).
¶ 15 Mr. Wilson used yard work as a means to groom the young boy. The abuse always occurred within the context of yard work, which consisted of community business. Mr. Wilson sexually abused Clayton while overseeing him as an employer, supervisor, landlord, and caretaker. The marital community benefited from Clayton's labor. Mr. Wilson paid Clayton for his work with community funds,[3] and only after he finished abusing Clayton on each occasion. Given the breadth of LaFramboise's second prong, these facts point confidently toward community liability because Mr. Wilson's torts occurred while he was on "some community errand, affair, or business at the time of the tort." Id. The facts here closely parallel those of LaFramboise, in which we assigned liability to the marital community. 42 Wash.2d at 199-200, 254 P.2d 485.
¶ 16 Ms. Wilson cites opinions that apply respondeat superior to determine whether a marital community bears liability for a spouse's individual tort. Her reference to these cases (including LaFramboise) is confounding because their underlying current counsels when an agent or member of a marital community commits an intentional tort connected to the community, the community bears liability.[4] Ms. Wilson even cites one case that finds community liability for an intentional tort arguably less connected to the marital community than the instant facts. See McHenry v. Short, 29 Wash.2d 263, 186 P.2d 900 (1947) (assault committed by husband due to personal grudge, but while evicting victim from community rental property, deemed community liability). The cases cited by Ms. Wilson merely examine different facts under the same standard.[5] Other factually divergent cases come to the opposite conclusion and, instead, impose community liability. See, e.g., Blais v. Phillips, 7 Wash. App. 815, 502 P.2d 1245 (1972) (community liability for fight that arose in parking lot following a trial concerning management of community property); Benson v. Bush, 3 Wash.App. 777, 477 P.2d 929 (1970) (assault committed during dispute involving community dog deemed community liability).
¶ 17 In the end LaFramboise presents the closest facts to the instant matter. We applied our reasoning in LaFramboise with respondeat superior in mind and found community liability. 42 Wash.2d at 200, 254 P.2d 485. The aforementioned cases, at best, show inconsistent application of our law and, at worst, undermine Ms. Wilson's position.
¶ 18 Ms. Wilson further contends her former husband's intentional sexual tort brought him outside the scope of community business while sexually abusing Clayton, thus excusing liability of the marital community. She cites numerous cases involving the employer-employee (or master-servant) relationship. See, e.g., Niece v. Elmview Group Home, 131 Wash.2d 39, 929 P.2d 420 (1997) (employer not liable for sexual assault committed by employee); C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wash.2d 699, 985 *283 P.2d 262 (1999) (diocese held not liable for actions of pedophile priest); Bratton v. Calkins, 73 Wash.App. 492, 870 P.2d 981 (1994) (school district not liable for sexual relationship between teacher-employee and student); Thompson v. Everett Clinic, 71 Wash.App. 548, 860 P.2d 1054 (1993) (hospital not liable for molestation committed by doctor-employee); S.H.C. v. Lu, 113 Wash.App. 511, 54 P.3d 174 (2002) (religious organization not liable for molestation committed by nonmanagerial guru). However, all are distinguishable because they do not address liability of a marital community. The cases upon which Ms. Wilson erroneously relies stand for the proposition that an employer is not liable for the intentional torts of its employeesan irrelevant issue here. Ms. Wilson also relies heavily on Francom v. Costco Wholesale Corp., 98 Wash.App. 845, 991 P.2d 1182 (2000). Francom held the victim of a nonmanagerial co-worker's sexual harassment could not recover from the harasser's marital community because the tort occurred outside the employee's scope of employment. Id. at 869. Francom, like the cases above, involved a nonmanagerial employee, not an owner or manager.
¶ 19 A husband or wife would be more properly considered an owner, employer, agent, or member of a marital community, not an employee. As the Court of Appeals noted, a more apt analogy is found in Glasgow v. Georgia-Pacific Corp., 103 Wash.2d 401, 693 P.2d 708 (1985). In Glasgow we found employer liability when an owner, manager, partner, or corporate officer personally participates in workplace harassment. Id. at 407, 693 P.2d 708. As a member of his marital community, Mr. Wilson's actions fit Glasgow better than the cases cited by Ms. Wilson.
¶ 20 We hold the Wilsons' marital community is liable for Mr. Wilson's intentional torts because he committed them while conducting community business.

II. Property transfer
¶ 21 The trial court found four distinct bases for voiding the Wilsons' property transfer: (1) actual fraud under RCW 19.40.041(a)(1), (2) conclusive common law fraud, (3) constructive fraud as to present creditors under RCW 19.40.051(a), and (4) constructive fraud as to present and future creditors under RCW 19.40.041(a)(2).
¶ 22 Ms. Wilson challenges only two of the trial court's four findings of fraud. "If the Supreme Court accepts review of a Court of Appeals decision, the Supreme Court will review only the questions raised in the motion for discretionary review. . . ." RAP 13.7(b); see also State v. Radcliffe, 164 Wash.2d 900, 907, 194 P.3d 250 (2008). In this case the two grounds not raised by Ms. Wilson each independently appliesand independently voids the transfereven if we were to reverse on the two claimed grounds.[6]
¶ 23 In any event the two grounds claimed by Ms. Wilson do not merit reversal. The trial court properly applied the law to the facts to void the property transfer.

a. Actual fraud under RCW 19.40.041(a)(1)
¶ 24 Under the Uniform Fraudulent Transfer Act (UFTA)[7] a transfer is fraudulent "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred" if the debtor conducted it with "actual intent to hinder, delay, or defraud any creditor of the debtor." RCW 19.40.041(a)(1). Subsection (b) of the statute provides 11 nonexclusive factors for determining actual intent.[8] Moreover RCW *284 26.16.210 requires spouses to prove good faith in the transfer if a plaintiff questions their motive. "In every case, where any question arises as to the good faith of any transaction between spouses or between domestic partners, whether a transaction between them directly or by intervention of third person or persons, the burden of proof shall be upon the party asserting the good faith." RCW 26.16.210.
¶ 25 Based on RCW 19.40.041(b)'s 11 factors, the facts of the present matter strongly suggest fraud in the Wilsons' property transfer: The Wilsons were married,[9] Mr. Wilson continued to live on one of the properties rent free after the transfer, the transfer occurred at breakneck speed between Mr. Wilson's release from jail and eventual incarceration, Ms. Wilson received over 90 percent of the assets, the spouses knew and discussed their exposure to tort liability, Mr. Wilson gave no equivalent consideration for transferring the property, and the transfer left Mr. Wilson insolvent. Under the UFTA these factors overwhelmingly suggest fraudulence in the transfer.

b. Common law fraud
¶ 26 Issues explicitly addressed in the UFTA "displace" common law principles. RCW 19.40.902. But when the UFTA is silent on a particular issue, common law tenets "supplement its provisions." Id. The UFTA does not explicitly address transfers between spouses. However, the UFTA does mention "insider[s]" (a broad group that includes relatives, as well as partnerships, general partners, and corporations) in the statute determining fraudulent transfers affecting present creditors. See RCW 19.40.051(b). "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent." Id.
¶ 27 In contrast the common law pinpoints transfers between spouses instead of lumping them among an amorphous group of entities. See, e.g., Davison v. Hewitt, 6 Wash.2d 131, 135-36, 106 P.2d 733 (1940) ("Irrespective of the motive actuating the transfers by the husband of his separate property to his wife, it is clear that, at the time the transfers were made to appellant, her husband was insolvent; hence, the act of transferring the property is conclusive evidence of fraud, and the intent is presumed from the act."). Both the trial court and Court of Appeals[10] found the UFTA did not displace the common law because the UFTA has no provision specifically governing transfers between spouses. The question, then, is whether RCW 19.40.051(b) and the definition of "insider" displace the common law approach to transfers between spouses.
¶ 28 The plain language of the UFTA broadly encompasses relatives, among many business relationships. However the common law rule is far more precise, dealing specifically and exclusively with transfers between spouses. The common law provides a thorough, long-standing, and examined history we should apply to "supplement [the UFTA's] provisions" for interspousal transfers. RCW 19.40.902. The common law's specificity on interspousal transfers deals more precisely with interspousal property transfers than the "insider" statute, RCW 19.40.051(b).

c. Constructive fraud under RCW 19.40.051(a) and RCW 19.40.041(a)(2)
¶ 29 Ms. Wilson did not raise these two independent grounds, which the trial *285 court partly relied upon to void the property transfer. Under RAP 13.7(b) we review only those claims raised in petitioner's petition for review.

III. Future lost wages
¶ 30 Ms. Wilson asserts Clayton must prove preinjury earning capacity to recover future lost wages. Citing a century-old case, Ms. Wilson claims Clayton's earning potential cannot be totaled without the "difference between the earning capacity before and after the injury." Pet. for Review at 20 (citing Cook v. Danaher Lumber Co., 61 Wash. 118, 112 P. 245 (1910)).
¶ 31 This claim is not well taken. "Evidence of damage is sufficient if it affords a reasonable basis for estimating loss and does not subject the trier of fact to mere speculation or conjecture." State v. Mark, 36 Wash.App. 428, 434, 675 P.2d 1250 (1984). Clayton's expert witnesses marshaled substantial evidence regarding the effect of Mr. Wilson's abuse. Clayton suffers emotional, physical, and mental trauma, all of which clearly impair his professional opportunities. Clayton presented ample expert testimony suggesting he will remain in entry-level employment his entire career. In sum Clayton presented substantial evidence to support the trial court's finding his future lost wages are $200,000.

CONCLUSION
¶ 32 We affirm the Court of Appeals because (1) under LaFramboise the Wilsons' marital community is liable for Mr. Wilson's intentional torts, which he committed while managing community business; (2) the property transfer between the Wilsons was void as fraudulent; and (3) Clayton proved future lost wages.
WE CONCUR: Chief Justice BARBARA A. MADSEN, Justice SUSAN OWENS, Justice CHARLES W. JOHNSON, Justice MARY E. FAIRHURST, Justice GERRY L. ALEXANDER, Justice JAMES M.
JOHNSON, Justice DEBRA L. STEPHENS, and Justice TOM CHAMBERS.
NOTES
[1] The Court of Appeals ordered the trial court to amend conclusion of law 8 to clarify Ms. Wilson "is liable to Andrew [Clayton] to the extent of the former community property," not her separate property. Clayton, 145 Wash.App. at 100, 186 P.3d 348.
[2] We later extended deElche, 95 Wash.2d 237, 622 P.2d 835, to include real property. See Keene v. Edie, 131 Wash.2d 822, 935 P.2d 588 (1997).
[3] Ms. Wilson claims, without any support, that LaFramboise is distinguishable because the marital community in that case received payment and, here, the marital community paid Clayton. There is no reason to make a distinction; both instances clearly involve managing community business.
[4] "The basis of the community liability is said to lie in the principle of respondeat superior, even though there is no principal or master in the ordinary sense. While there is greater difficulty in finding an intentional tort than a negligent tort within the ambit of the principle, the tort committed while managing or protecting a community property asset will result in community liability whether the act is negligent or intentional." Cross, supra, at 137 (footnote omitted).
[5] See, e.g., Bergman v. State, 187 Wash. 622, 60 P.2d 699 (1936) (community liability not imposed when husband self-destructively burned down community real estate for insurance money. But note, "[a]lthough the court refused community liability because the crime was outside the scope of management, the respondeat superior principle may not be that restrictive anymore, as later cases seem to establish." Cross, supra, at 143 n. 730); Smith v. Retallick, 48 Wash.2d 360, 293 P.2d 745 (1956) (marital community not liable when husband ceased community activity to begin fistfight with another man for purely personal reasons); Aichlmayr v. Lynch, 6 Wash.App. 434, 493 P.2d 1026 (1972) (marital community not liable when husband engaged in criminal conversation and alienation of affection with another man's wife).
[6] Ms. Wilson claims only actual fraud under RCW 19.40.041(a)(1) and conclusive common law fraud. See Pet. for Rev. at 16-19.
[7] Our state legislature adopted the UFTA in 1987. It is codified in chapter 19.40, RCW.
[8] The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
RCW 19.40.041(b)(1)-(11).
[9] The term "insider" under the UFTA includes a "relative," which includes a "spouse." RCW 19.40.011(7)(i)(A) & (11).
[10] Clayton, 145 Wash.App. at 104, 186 P.3d 348.