# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

KEVIN LAURENCE LEWIS,

Appellant.

No. 83594-7-I

DIVISION ONE

UNPUBLISHED OPINION

BIRK, J. — Kevin Lewis appeals his conviction for aggravated first degree murder. The State's theory was that Lewis hired his cousin Jerradon Phelps to kill his wife Amanda Canales, and that Phelps, together with his girlfriend Alexis Hale, mistakenly killed Canales's sister Alisha Canales-McGuire. Lewis argues the trial court erred in making certain evidentiary rulings, denying his motion to suppress statements he contends were admitted in violation of Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), denying his motion to suppress evidence obtained through search warrants he contends violated the Fourth Amendment to the United States Constitution, failing to give a limiting instruction concerning certain evidence under ER 404(b), refusing his proposed lesser included offense instruction on first degree manslaughter, and denying his motion to dismiss for governmental misconduct under CrR 8.3(b). Lewis further asserts cumulative error, ineffective assistance of counsel, and error in a lifetime no-

contact order prohibiting contact with his children. We affirm Lewis's conviction and remand for the trial court to consider the impact of the no-contact order on Lewis's fundamental right to parent.

I

The State presented the following evidence at trial.

Lewis and Canales were married in 2009, and subsequently had three children together. Canales moved out of Lewis's home in February 2017 and moved into a duplex in Everett. Canales's new residence was about a 10 minute drive from Lewis's home. In June 2017, Lewis called Canales and tried to convince her to come back. Canales testified that during the phone call, she declined to go back, which made Lewis angry:

> [Canales] And then he said, "Come back or else."
> [The State] And when he said, "Come back or else," what did you say?
> [Canales] I said, "Or else what?" And then he said, "Or else I'm going to take you to court and get custody of the kids and alimony and child support. And if I don't get it, I'm going to kill you."
> [The State] And what did you say when he said that?
> [Canales] And I said, "What?" And he said, "You heard me. I'm going to fucking kill you."

Concerned Lewis could be serious, Canales reported the call to the police. On June 20, 2017, Lewis appeared unannounced at Canales's house, very early in the morning. Canales called the police.

Canales obtained a protection order that included the couple's three children. The order was served on Lewis on June 29, 2017. The order was reissued three times. Lewis later appeared at Canales's residence again, yelling at a friend of Canales's who was installing surveillance cameras at Canales's

2

home. On July 25, 2017, Abigail Ruggles, the family's live in nanny, reported after having gone to Lewis's home to retrieve some of her belongings that Lewis asked her to "[t]ell that bitch [Canales] that none of the stuff in the house was hers." During this period, Lewis had contact with his children though supervised visitations. The family used A Kat's Eye Supervised Visitation Services.

On July 28, 2017, Lewis filed a petition for dissolution and requested child support, spousal support, and custody of the children. On August 23, 2017, the family court entered temporary orders in which it denied Lewis's requests and ordered Lewis to pay Canales child support. The family court ordered that the children live with Canales.

Kathleen Westvold-Naekel worked as a supervised visitation provider for A Kat's Eye Supervised Visitation Services. Westvold-Naekel first supervised visits for the family on August 30, 2017. Per visitation protocol, Canales would drop off the children down the street from Lewis's home, out of the line of sight from the home. Canales testified Lewis "had to stay inside the home during this time period of the drop-off and pickup."

On September 19, 2017, Canales was out of town on a business trip. Canales's sister, Canales-McGuire, helped Ruggles take care of the children while Canales was gone. That evening, Ruggles and Canales-McGuire dropped the children off at Lewis's for a supervised visitation. The visit was scheduled for 6:15 to 8:15 p.m. Westvold-Naekel was the visitation supervisor. Westvold-Naekel testified that during the visit, Lewis's behavior was different than it had been on August 30. During the September 19 visit, "there was very little interaction. [Lewis]

3

was present physically. The verbal communication between him and the children was for the most part lacking, nonexistent." Westvold-Naekel felt "[v]ery uncomfortable" during the visit and had "a gut feeling there was something" different about the visit. Westvold-Naekel observed Lewis on his phone consistently throughout the evening. She could

> hear a vibration constantly throughout the night. And he would be responding. He would be texting or replying to whatever it was that was on his phone. I did not see. The phone took precedence that visit. That was the—that seemed to be the sole focus of that visit for [Lewis].

Westvold-Naekel documented the visit ending at 8:13 p.m.

After picking up the children, Ruggles and Canales-McGuire drove back to Canales' home and got the children ready for bed. Lewis's and Canales's daughters slept in a bedroom upstairs. Their son slept on a couch in the living room, down the hall from the front door. Ruggles went to bed around midnight. Ruggles testified she woke up to "some loud pops and a crash" on the morning of September 20. Ruggles went downstairs and came around the corner of the banister and saw Canales-McGuire's body on the floor and a stream of blood. After turning on the lights, Ruggles ran upstairs to get her cell phone to call 911. Ruggles's 911 call was received at 1:55 a.m. After "[l]ess than 10 minutes," the police arrived on scene.

Based on evidence at the crime scene, law enforcement concluded Canales-McGuire was shot when the door was partially open, and the shooter fired at least seven shots, which originated from the exterior of the residence and came into the interior. Four recovered bullets were consistent with a nine millimeter

4

Luger. The seven fired cartridge cases were identified as having been fired from the same firearm. The evidence at the scene was consistent with someone firing shots, then moving towards the door of the house and firing again inside the door.

The medical examiner, Daniel Selove MD, identified the cause of death as multiple gunshot wounds to the head and trunk. Canales-McGuire was struck by five shots. Two of the wounds showed gunpowder stippling injury. Dr. Selove testified he could not determine the sequence of the five shots, but opined the last two gunshot wounds to the head with stippling were likely the last two injuries inflicted. The State asked Dr. Selove whether the gunshot wounds could have been inflicted in a particular sequence:

> [The State] Dr. Selove, with regards to both your findings and your observations both at the scene and during autopsy, hypothetically if a person that committed the murder said that they fired from outside the residence and then moved towards the front door, shooting with the gun either just beyond the threshold of the doorway or having stepped into the doorway to fire the final shots, would that be consistent or inconsistent with your findings based on your training and experience as a medical examiner?
> [Dr. Selove] That description of the scenario is consistent with my findings.
> [The State] Can you tell us why?
> [Dr. Selove] Because not only would firing inside the doorway account for the two casings in the foyer near the body but also for two closer-distance range-of-fire gunshots that I observed on the head.

Dr. Selove further testified that before the shots to the head and with only the three shots to the chest, if those three shots occurred first, Canales-McGuire could still make deliberate conscious movement.

Snohomish County Sheriff's Office Detectives Eric Fagan and Brad Walvatne were assigned to contact Lewis to see if he had information about the

shooting. They sought to contact Lewis because they learned he was Canales's "ex," he was the father of the children in the house, and there had been previous incidents involving Canales and Lewis. They contacted Lewis at 5:05 a.m. Lewis answered the door wearing a white tank top.

Near Lewis's home, detectives located two neighboring houses with exterior cameras. One camera showed that at 1:10 a.m. that morning, a light colored vehicle approached Lewis's house, and at 1:12 a.m. a person exited Lewis's residence and got in the vehicle, and it left. The person appeared to be wearing a light-colored top. At that time, the residents of Lewis's household included Lewis, his mother, his sister, and a renter, Alexander Dorell. At 1:34 a.m. the same vehicle returned, and at 1:37 a.m. a person exited the car and entered Lewis's residence, and the vehicle left again. The camera from the other neighboring house showed that the car appeared to be missing the front passenger hubcap.

Law enforcement received a tip from Jillian Lee. Lee told detectives that a person she knew as "Angie," later identified as Alexis Hale, told her at a party that she had been hired to kill someone. Hale implicated Phelps, a mutual friend of Lee's, saying he had an "uncle" who had offered to pay them.

Public Facebook information revealed that Phelps and Lewis were cousins. Cell phone records showed that on September 19-20, 2017, Phelps's cell phone traveled from "his residence across the mountains to within about 6/10ths of a mile of the scene of the murder and at the time of the murder, and then traveled back to his house in Spokane." Social media records showed Phelps and Hale together in Spokane at 4:27 p.m. Phelps's phone's last data session in Spokane was at

6

8:36 p.m.  At 11:04 p.m., his phone used a cell site on Interstate 90 that was 157 miles from Spokane.  At 12:00 a.m. his phone used cell sites at Snoqualmie Pass.  At 12:49 p.m., Hale created a Snapchat[1] video at signs for exit 14 on Interstate 405 in Bellevue.  Snohomish County Detective Tedd Betts testified the fastest estimated Google[2] drive time from that location on Interstate 405 to Lewis's residence was 22 minutes, which would project arrival at Lewis's residence at 1:11 a.m.

Sheriff's deputies canvassed local businesses for possible video evidence.  They collected video from a business at the intersection of Gibson Road and Highway 99.  This was "directly on the Google recommended route" from Lewis's residence to Canales's residence.  This video showed a car appearing to be the same car shown near Lewis's residence based on a darker appearing front passenger wheel.  The car passed the intersection at 1:21 a.m.  It passed again at 1:44 a.m.

Phelps's phone used a cell site near Canales's residence at 1:53 a.m. and 1:54 a.m.  The usage was for data sessions, which would be consistent with using a mapping program.  The same car shown in the earlier described videos passed at the intersection of Highway 99 and Gibson Road again at 2:04 a.m., coming from a different direction, but traveling towards the scene of the incident.  The vehicle passed again at 2:08 a.m., returning to Highway 99 from the west on Gibson Road.  Hale's phone used a cell site at 2:18 a.m. near Interstate 405 just

---

[1] Snapchat is a cell phone app similar to text messaging.
[2] Google is a search engine with a mapping function that includes drive time information.

7

north of Highway 522. Using Google maps, Betts estimated driving from Highway 99 and Gibson Road to that location on Interstate 405 would typically take 12 minutes. Phelps's phone used several sites in the Bellevue area at 2:28 a.m. This was an estimated 10 minutes' travel time from the location where Hale's phone used the cell site earlier. Hale's Snapchat account contained a video taken at 3:47 a.m. showing Phelps in a car fanning a number of one hundred dollar bills.

Phelps agreed to testify against Lewis in exchange for a reduction of his aggravated first degree murder charge to first degree murder with a firearm enhancement. Phelps testified Lewis reached out to him to see if Phelps knew an "OG," or "original gangster," who could do something for him. Phelps "thought that [Lewis] was asking me if I knew anybody who would kill somebody for him." Lewis offered to pay $1,200.00. Phelps told Lewis he would look around, but he also offered to do it himself. Phelps testified Lewis did not seem to think that Phelps "doing it myself" was "sufficient enough," or that Phelps was "qualified enough." After discussing that a second person should be involved, Lewis "put another price out there, said [$]2,400." Phelps was dating Hale at the time and told her about Lewis's offer. Phelps testified that Hale was more than willing to accompany him on the trip and that she provided him with a firearm. Hale's mother testified she had purchased a nine millimeter gun that had gone missing. She identified trial exhibit 248 as the gun she had purchased. Phelps testified he told Lewis he found another individual and a gun for the job.

Phelps and Hale drove to Lewis's address. When they arrived, Lewis came outside and got into the backseat. Lewis directed Phelps to Canales's home, and

pointed out which door was hers. Lewis showed Phelps a photo of the intended target. On the way back to Lewis's house, Lewis gave Phelps an envelope of money amounting to "24" in old and new $100 dollar bills, and some $20 bills. Dorell, Lewis's renter, testified Lewis had informed Dorell he had a room available, and Dorell had started renting from Lewis on August 1, 2017, paying $550.00 per month in cash. Phelps testified Hale had asked beforehand whether children would be present in the home, and at Phelps's inquiry Lewis confirmed children would be in the home.

After dropping Lewis back at his residence, Phelps and Hale went back to the location that Lewis had pointed out. The two exited the vehicle and walked towards the home. Phelps stopped next to the garage while Hale walked to the front door. As a woman opened the front door, Hale walked off and Phelps fired the gun until it was empty. Phelps fired the first few shots from his position near the garage, and fired the last couple after walking up to the front porch. The muzzle of the gun crossed the threshold. The last couple of shots were around the neck and head area. Phelps and Hale left in their car, but then returned. They believed they might have left a glove at the scene, and went back for it. When they returned, they saw police cars, so they turned around and left. They accessed GPS directions and drove back to Spokane.

Phelps testified that once he completed the murder, "I wasn't supposed to message him afterwards. There was no contact supposed to be made. So, you know, I was supposed to post something on my Story—Snapchat Story—that basically was like a symbolling message like 'I did it' kind of thing." Phelps testified

9

he could not remember when, but at some point "[m]uch later" after the murder, Lewis contacted Phelps via Snapchat stating, " 'They are watching me.' " Phelps told Lewis not to tell, to which Lewis responded, " 'Never in a million years.' "

II

The trial court admitted other evidence, several categories of which Lewis asserts were error. As to these categories, we conclude either the trial court did not err, or any error was harmless.

A

Lewis asserts the trial court should have suppressed statements he made in the absence of <u>Miranda</u> warnings. When Fagan and Walvatne contacted Lewis at his residence the morning of the shooting, Walvatne informed Lewis there had been a shooting at Canales's house. They had a conversation in which Lewis stated that he was home all night. When asked if he knew where Canales was, Lewis answered, " 'She should be at home' " and expressed surprise when informed she was not. Fagan testified Lewis did not inquire about his children. The State offered these statements at trial. Lewis argues the trial court erred by concluding he was not in custody when he made these statements.

The trial court held a pretrial CrR 3.5 hearing. The morning of the shooting, Fagan and Walvatne went to Lewis's residence along with Snohomish County Deputies Jeffrey Miner and William Binkley. The detectives asked the deputies to approach Lewis's residence with them as detailed security. Fagan testified that because he and Walvatne were in unmarked clothing, it was necessary to have

patrol deputies on scene so individuals would know the detectives were law enforcement.

Miner went to a neighbor's porch while the two detectives approached the front door. Binkley stood in the front yard area, about 20 feet behind the detectives. All four officers were carrying their duty-issued handguns in their holsters. Miner also carried a patrol rifle. Miner testified the rifle stayed in a "low ready position. So it would be pointed, swung on your person, and pointed at the ground. It is ready to be used, but it is not pointing at anything but the ground." Walvatne knocked on the front door multiple times. After a minute or two, Lewis opened the door. When Lewis answered the door, Dorell appeared behind him. Walvatne advised Lewis he wanted to talk to him privately and Lewis offered to step outside. When Lewis was on the front patio, Walvatne advised Lewis that he was not under arrest. Walvate asked Lewis if he would be willing to walk to his work truck to talk privately, and Lewis agreed.

As the detectives and Lewis walked to Walvatne's truck, Miner followed behind to continue security detail. While walking, Lewis made statements expressing surprise that Canales had not been home that night.

When the two detectives and Lewis arrived at the truck, Lewis sat in the front passenger seat, Fagan sat in the seat behind him, and Walvatne sat in the driver's seat. Miner and Binkley returned to their patrol vehicles. Inside the vehicle, Walvatne advised Lewis he was not under arrest and was free to leave. Walvatne told Lewis that he was potentially identified as a witness in the case because of previous history between him and Canales. Lewis asked Walvatne if

11

he needed a lawyer, to which Walvatne stated he could not give legal advice. Walvatne asked Lewis whether or not he was home the previous night, and Lewis confirmed he was home. When asked whether he would be willing to provide a statement to answer additional questions, Lewis replied, " 'That is something I might need a lawyer for.' " Walvatne told Lewis he was free to leave. Lewis opened the truck door, exited the vehicle, and walked away. Fagan testified that Lewis sat in the truck for "roughly five minutes."

The trial court ruled Lewis was not in custody for purposes of Miranda, nor was he subjected to a custodial interrogation. We agree.

The Fifth Amendment states that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S CONST. amend. V. Whether a person is in custody for purposes of Miranda is reviewed de novo. State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). A custody determination is an objective test that asks whether a reasonable person in the suspect's position would feel restrained to the degree associated with formal arrest. State v. Escalante, 195 Wn.2d 526, 533-34, 461 P.3d 1183 (2020). Courts must examine the question based upon the totality of the circumstances. Id. "Relevant circumstances may include the nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning." Id. at 534. "An investigative encounter with a suspect based on reasonable suspicion not amounting to probable cause does not require Miranda warnings." State v. France, 121 Wn. App. 394, 399, 88 P.3d 1003 (2004).

Detectives first interacted with Lewis on the front porch of his home. After being asked to speak privately with detectives, Lewis offered to step outside. Walvatne advised Lewis he was not under arrest and asked if the three could speak inside Walvatne's truck. Neither detective told Lewis he was required to go to the vehicle; instead, Walvatne assured Lewis he was not under arrest and he did not have to speak with them. Inside the truck, Walvatne told Lewis he was not under arrest and was free to leave. After approximately five minutes in the vehicle, Lewis terminated the conversation. Lewis was never physically restrained. Given the totality of the circumstances, a reasonable person in Lewis's position would not feel restrained to the degree associated with formal arrest.

Lewis additionally asks this court to "interpret article I, section 9 of the Washington Constitution separate from the Fifth Amendment and hold that article I, section 9 requires courts to consider the race and ethnicity of the suspect amongst the totality of the circumstances in determining whether that person was subject to a custodial interrogation." Lewis argues the trial court erred in not incorporating Lewis's experiences as a Black man into the context of a custodial interrogation evaluation. All four officers responding to Lewis's residence were white. Article I, section 9 of the Washington constitution states in relevant part, "No person shall be compelled in any criminal case to give evidence against himself." Lewis asks the court to engage in an analysis under State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986) to support this argument.

Lewis points to State v. Sum, where the court held that in determining "whether a person has been seized by law enforcement for purposes of article I,

13

section 7 of the Washington Constitution[,] 'all the circumstances' of the encounter includes the race and ethnicity of the allegedly seized person." 199 Wn.2d 627, 630, 511 P.3d 92 (2022). Explaining the seizure inquiry under article I, section 7, the court said, "[W]hile it is true that there is no uniform life experience or perspective shared by all people of color, heightened police scrutiny of the BIPOC [Black, Indigenous, and other People of Color] community is certainly common enough to establish that race and ethnicity have at least some relevance to the question of whether a person was seized." Id. at 647. Taking guidance from GR 37, the court explained that the objective inquiry for whether a seizure has occurred turns on whether an "objective observer could conclude" the person was not free to leave, having awareness that "implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in disproportionate police contacts, investigative seizures, and uses of force against BIPOC in Washington." Id. at 653.

The Supreme Court held in State v. Earls, 116 Wn.2d 364, 377-78, 805 P.2d 211 (1991), State v. Franco, 96 Wn.2d 816, 829, 639 P.2d 1320 (1982), abrogated on other grounds by State v. Sandholm, 184 Wn.2d 726, 364 P.3d 87 (2015), and State v. Moore, 79 Wn.2d 51, 57, 483 P.2d 630 (1971) that article I, section 9 is coextensive with the Fifth Amendment. This is binding on this court. Additionally, if we were to apply the framework of Sum and GR 37, Lewis does not indicate how this record shows an aware objective observer could conclude under the Sum framework that Lewis was in custody to the degree associated with formal arrest. In Sum, a police officer, based on his knowledge of months-earlier events in the

14

"area," indicated he was alerted to Sum's vehicle " 'because it was parked there.' " 199 Wn.2d at 632. The officer approached the vehicle because the driver was " 'slumped over,' " which called for " 'a social contact.' " Id. In this case, police were investigating a homicide to which Lewis's name was connected through past domestic response calls. Recognizing the four officers were white and Lewis was Black, the nature of the police inquiry was much more specific than in Sum. It was also less coercive. In Sum, the officer made contact with the driver and immediately began questioning Sum. Id. at 633. Here, officers knocked and advised Lewis he was not under arrest and could decline to speak with them. After speaking with the detectives inside the truck for five minutes, Lewis terminated the conversation. Lewis showed he subjectively appreciated his option to terminate the conversation by doing so, and his doing so was respected. The trial court did not err in denying Lewis's motion to suppress the statements he made on September 20, 2017.

B

Lewis asserts the trial court erred by not excluding under ER 404(b) three assaults he had committed against Canales, two of which resulted in conviction. We disagree.

The first assault occurred in 2009. Lewis hit Canales on the side of her head, which injured her ear. Canales said hearing was difficult for about two weeks. The second assault occurred in November 2016, when Lewis punched Canales in the face. Canales sustained a swollen eye, two broken teeth, and had vision issues for a few months after. The final assault occurred in June 2017.

15

Canales was getting out of her vehicle when she was hit on the head repeatedly, at least 50 times. Lewis was convicted of the latter two assaults.

The State made a pretrial motion to admit evidence of these three assaults against Canales (among other evidence of other acts) to prove motive, intent, absence of mistake, and common scheme or plan. The trial court found (1) the events occurred by a preponderance of the evidence, (2) the admissible purposes were to show motive, opportunity, intent, common scheme, or planning, (3) the evidence was relevant to prove intent because "Lewis is denying involvement in what is clearly a crime," and (4) the probative value outweighed the prejudicial effect of the evidence.

Under ER 404(b), evidence of other crimes, wrongs, or acts is inadmissible to prove character to show action in conformity therewith. However, the rule does not bar evidence for another purpose, provided that it is relevant and its probative value outweighs the danger of unfair prejudice. State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). To admit evidence of a criminal defendant's prior misconduct, "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." State v. Vy Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

We review a trial court's determination to admit or exclude evidence for an abuse of discretion. State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). An abuse of discretion occurs when a trial court's ruling is based on untenable grounds or made for untenable reasons. Id.

The trial court found motive to be one of the admissible purposes for the evidence. Motive "goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act." State v. Powell, 126 Wn.2d 244, 259, 893 P.2d 615 (1995). "Evidence of previous quarrels and ill feeling is admissible to show motive." State v. Hoyer, 105 Wash. 160, 163, 177 P. 683 (1919). The evidence must be "of consequence to the action to justify its admission." Powell, 126 Wn.2d at 260. Prior misconduct evidence that demonstrates motive is of consequence to the action in a case where establishing motive is necessary and only circumstantial proof of guilt exists. Id.

Lewis concedes "it is understandable why the trial court identified motive as a purpose of admission for the November 2016 and June 2017 assaults." Motive is also a proper purpose for admission of the 2009 assault together with the later assaults. Evidence of the three prior assaults tended to support Lewis's particular motive to harm Canales and the history of hostility between them. Cf. Powell, 126 Wn.2d at 260 (holding prior assaults admissible to show motive for murder). Because motive purpose is "a proper basis" for the evidence to be admitted under ER 404(b), we need not reach the other purposes identified by the trial court. Cf. id. at 259.

The evidence also was not unfairly prejudicial compared to its probative value. Unfair prejudice is caused by evidence that tends to arouse an emotional, irrational, or confused response from the trier of fact. See State v. Rice, 48 Wn. App. 7, 13, 737 P.2d 726 (1987). However, proper evidence will not be excluded because it may also tend to show that the defendant committed another crime unrelated to the one charged. Powell, 126 Wn.2d at 264. The trial court has broad discretion in making this determination and its ruling is reviewed for an abuse of discretion. State v. Bell, 60 Wn. App. 561, 565, 805 P.2d 815 (1991).

The prior assaults were probative. The State needed to prove Lewis intended to kill Canales. Evidence of prior assaults explained Lewis and Canales's previous relationship. Additionally, the trial court properly weighed the prejudice of the three prior assaults against their probative value in its decision to admit the evidence. The assaults were not comparable to the charged aggravated first degree murder, so any unfair prejudice in suggesting action in conformity with the earlier assaults was minimal. The trial court heard extensive argument from the parties and concluded the probative value of the evidence was not outweighed by its unfairly prejudicial effect. The trial court did not abuse its discretion in admitting the evidence.

Lewis relatedly argues the trial court erred in failing to give a limiting instruction for this and other ER 404(b) evidence. We disagree. If evidence of a defendant's other crimes, wrongs, or acts is admissible for a proper purpose, the defendant is entitled to a limiting instruction on request. State v. Russell, 171 Wn.2d 118, 124, 249 P.3d 604 (2011). An adequate ER 404(b) limiting instruction

must, at a minimum, inform the jury of the purpose for which the evidence is admitted and that the evidence may not be used for the purpose of concluding that the defendant has a particular character and has acted in conformity with that character. Cf. State v. Lough, 125 Wn.2d 847, 864, 889 P.2d 487 (1995).

The parties discussed an ER 404(b) limiting instruction at trial, but disagreed over the form of the instruction. Lewis said, "I don't like the [Washington Pattern Jury Instruction] for this particular case for reasons that are likely understood by the Court and the State that there's so much, respectfully, that Your Honor let in. We are drafting something that's a little bit different." Lewis proposed the following instruction:

> Over the course of the trial, you have heard evidence concerning alleged prior acts of misconduct by the defendant on dates other than that of the charged crime in this case. It is up to you to determine whether these alleged prior acts occurred and that the defendant committed them. You are not bound to accept the State's allegations in this regard. If you determine the defendant did commit these alleged prior acts, the State still must prove that these prior acts are evidence of an element of the crime of murder in the first degree. Even if you determine the State has proven that the defendant committed these prior acts, the State still has the burden of proving each and every element of the crime of murder in the first degree.

The State objected to this instruction because it did not "give[] any instructions to the jury or even tell[] them what evidence has been admitted [for which] a limiting instruction is needed." The trial court ruled Lewis's proposed limiting instruction was not as thorough as was required, and additional information needed to be included. Lewis does not argue on appeal that the trial court erred by not giving this specific instruction.

The State proposed an alternative limiting instruction.[3] Lewis objected to the State's instruction, and told the trial court "if Your Honor does not wish to give our limiting instruction, then after discussion with my client several times about this, we would simply ask the Court not to give a limiting instruction at all." Because Lewis did not offer a compliant limiting instruction, and objected to the State's limiting instruction, the State removed its request for the instruction. Consistent with the defense's request that the court give no instruction, the trial court did not provide a limiting instruction.

In Gresham, the court said, "[O]nce a criminal defendant requests a limiting instruction, the trial court has a duty to correctly instruct the jury, notwithstanding defense counsel's failure to propose a correct instruction." 173 Wn.2d at 424. Gresham relied on State v. Gobel, which stated, "[T]he court should state to the jury whatever *it determines* is the purpose (or purposes) for which the evidence is admissible; and it should also be *the court's duty* to give the cautionary instruction

---

[3] The State's proposed limiting instruction read:

Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of testimony or exhibits relating to the defendant's alleged assault of [Canales] in Spokane in 2009, his prior conviction for Second Degree Assault Domestic Violence from the incident with [Canales] occurring on November 18, 2016, defendant's presence at [Canales'] residence on June 20, 2017, and his prior conviction for Second Degree Assault Domestic Violence from the incident with [Canales] occurring on June 21, 2017. You may consider this evidence for purposes of determining the defendant's motive, intent, preparation, or common scheme or plan. You may also consider this evidence for purposes of determining whether the offense was an aggravated domestic violence offense. You may not consider it for any other purpose. Any discussion of this evidence during your deliberations must be consistent with this limitation.

that such evidence is to be considered for no other purpose or purposes." Id. (quoting Gobel, 36 Wn.2d 367, 379, 218 P.3d 300 (1950) (emphasis added)). But Gresham is distinguishable, because the defendant there maintained his request for a limiting instruction, albeit one requiring modification to accurately describe the purpose in that case of showing common scheme or plan. 173 Wn.2d at 424. The defendant never took the position, as Lewis did, that the court should give no instruction. Generally, appellate courts do not allow a defendant to ask a trial court for specific relief and then seek reversal on appeal because the court granted the requested relief. See State v. Carson, 179 Wn. App. 961, 973, 320 P.3d 185 (2014), aff'd, 184 Wn.2d 207, 357 P.3d 1064 (2015). Lewis asked the court not to give a limiting instruction, and in that circumstance, it was not error for the court to decline to give an instruction.

C

Lewis argues the trial court abused its discretion when, he says, it ruled he opened the door to evidence that he "psychologically abused" his children. We disagree.

Before trial, the State moved to allow Westvold-Naekel to testify about Lewis's demeanor during the supervised visit the evening before the murder. The State argued the evidence should be admitted as res gestae, not under ER 404(b). Lewis agreed her observations were not subject to ER 404(b). The trial court ruled that the visit supervisor could testify to what she saw, but not "what was going through [Lewis's] mind or not." In its written order, the trial court ruled that the parties were in agreement the evidence was res gestae. However, despite the

21

parties' oral stipulation, the trial court additionally ruled the evidence was admissible under ER 404(b).

On direct examination, Westvold-Naekel testified, "There was no initiation on [Lewis's] part to converse with the children or talk about things aside from one particular incident at the beginning. And there was no hugging[,] cuddling, [or] snuggling of the children." On cross-examination, Lewis asked the supervisor whether she forgot about the fact that Lewis "was dancing with his kids, per your report, to dance videos? And in fact you write, 'He captures the girls dancing on video.'" Lewis further questioned Westvold-Naekel about whether Lewis was dancing and playing with his children that night. Outside the presence of the jury, the State argued that because of the defense cross-examination "the door has been opened" to further evidence that Lewis made one child cry and "was not this picture of dancing happiness, as defense has painted him." The trial court agreed.

On re-direct, the State elicited testimony that during the visit, Lewis asked one of his children to pick something up. After repeated requests, the child began to cry. Later, "Lewis told him that he needed to listen when he's asked to do something and asked [the child] if he understood. [The child] responded, 'Yes.' And then [Lewis] said, ' "Yes, sir." You need to say, "Yes, sir." ' [The child] did not say anything. And then [Lewis] returned him to the time-out, and [the child] began crying again." Then, while two other children were eating, one took a bite of the other's mashed potatoes and spit it back on the other's plate. That child wished not to eat those mashed potatoes, saying, "[T]hey taste like spit." Lewis

"responded to her to stop complaining and finish her dinner. 'I don't want to hear it.' "

"[E]vidence of other crimes or bad acts is admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime." State v. Lillard, 122 Wn. App. 422, 432, 93 P.3d 969 (2004). Res gestae evidence is not evidence of unrelated prior criminal activity but is itself a part of the crime charged. State v. Sublett, 156 Wn. App. 160, 196, 231 P.3d 231 (2010), aff'd, 176 Wn.2d 58, 292 P.3d 715 (2012) (plurality opinion). Under the State's theory, Lewis was acting unusually towards his children because he knew Phelps and Hale were preparing to drive from Spokane to Everett to commit the murder. The evidence was probative of Lewis's state of mind and involvement in the murder, and relevant to establishing an essential element of the State's case. The trial court did not abuse its discretion in admitting this evidence.

D

Lewis argues the trial court erred in admitting two photographs, exhibits 200 and 202, which showed Canales-McGuire's deceased body with trajectory rods placed in her wounds to illustrate the path of bullets that struck her. The State argues the photographs were relevant to supporting Phelps's credibility because they supported his description of the shooting. Lewis argues the exhibits "contributed nothing of additional, substantial probative value," and "invited jurors to punish Lewis for degrading the deceased." We disagree.

To the extent of the exhibits transmitted to this court, exhibits 200 and 202 were two photographs among at least 25 photographs generally showing Canales-

23

McGuire deceased at the crime scene, the crime scene after her body had been removed, and her gunshot wounds noted during autopsy. These photographs depict a bloody shooting scene and Canales-McGuire's deceased body afflicted by gunshot wounds. Lewis asserts error based on only exhibits 200 and 202 because of their additionally showing trajectory rods placed in the gunshot wounds to illustrate bullet paths.

"Accurate photographic representations are admissible, even if gruesome, if their probative value outweighs their prejudicial effect." State v. Crenshaw, 98 Wn.2d 789, 806, 659 P.2d 488 (1983). However, both trial courts and prosecutors must "exercise their discretion in the use of gruesome photographs," and prosecutors may not "introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary." Id. at 807. In cases "where proof of the criminal act may be amply proven through testimony and noninflammatory evidence," prosecutors should "use restraint in their reliance on gruesome and repetitive photographs." Id. "In considering such photographs," courts "reversed the customary presumption of admissibility under ER 403" and the photographs are admissible "if the probative value outweighs the prejudicial effect." City of Auburn v. Hedlund, 165 Wn.2d 645, 655, 201 P.3d 315 (2009). We review the trial court's ruling admitting such photographs for abuse of discretion. Crenshaw, 98 Wn.2d at 806.

In State v. Sargent, the State argued photographic evidence of the wounds to the back of a murder victim's head was "relevant to show the force of the fatal blows," a fact the State cited as supporting an inference of premeditation. 40 Wn.

App. 340, 348-49, 698 P.2d 598 (1985). We expressed skepticism of the State's argument and held the prejudicial effect of the evidence outweighed any probative value. Id. at 349. The State also relied on photographs of the victim at the murder scene, but the photographs were cumulative of "testimony from the firefighters who discovered the body that reveals the same information," and we explained, "Diagrams could reveal the same information as the photographs in a nonprejudicial manner." Id. In State v. Fraser, the defendant admitted shooting the decedent but argued the shooting was an "unintended result" of actions the defendant took when the decedent had "lung[ed] at him." 170 Wn. App. 13, 18, 282 P.3d 152 (2012). The trial court admitted an autopsy photograph with a metal rod placed to illustrate the path of the bullet, and another photograph showing damage inside the decedent's mouth. Id. at 29. The record did not indicate the photograph was used to inflame the jury. Id. We affirmed, explaining the photograph "helped illustrate the medical examiner's testimony on the damage caused by the bullet and the trajectory of the bullet and showed details the other photograph did not." Id. at 30.

Relying on exhibit 200, Dr. Selove testified that one trajectory rod showed one shot taking "almost a level pathway through the head," perhaps "slightly downward." In contrast, another trajectory was shown to be "sharply downward in her body, slightly from her front to her back and slightly from her left downward toward her right." This indicated Canales-McGuire was looking at the gun, either from a standing or supine position, when one shot was fired, and bent forward with respect to the muzzle for the other. An additional rod shown in exhibit 202 showed

25

that, from another shot, a bullet "passed downward from her left to her right, from her front toward her back." Dr. Selove described the degree to which each of the five shots posed life-threatening injuries.

The analysis of the bullet trajectories was relevant to Dr. Selove's assessment of the sequence in which the shots were fired and whether that sequence was consistent with Phelps's account. It was also relevant to determining the lethality of the shots and whether the events could have occurred in the manner Phelps reported. In both cases Dr. Selove's analysis of Canales-McGuire's wounds supported that the shooting could have occurred in the manner Phelps reported—first firing one set of shots from the garage and then firing another set of shots after Canales-McGuire had fallen and from closer range. The photographic evidence showing the bullet trajectories illustrated Dr. Selove's testimony, provided support for his opinions, and was not used to inspire an emotional response. This was consistent with Fraser. Because the State relied on Exhibits 200 and 202 to fairly illustrate Dr. Selove's opinions and did not seek to inspire an emotional reaction, the trial court did not abuse its discretion in admitting these exhibits.

E

Lewis argues the trial court erred by denying his motion to suppress the results of search warrants through which police obtained information from Sprint, Facebook, Google, Snapchat, Bank of America, NA, and Key Bank. After considering the evidence introduced at trial obtained through these warrants in comparison to the evidence described above, we conclude any error concerning

the warrants was harmless because "any reasonable trier of fact would have reached the same result" based on "the 'overwhelming untainted evidence.'" State v. Thompson, 151 Wn.2d 793, 808, 92 P.3d 228 (2004) (quoting State v. Smith, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)).

From the Sprint records, detectives learned that Lewis owned an Android phone. They additionally learned that cell site location information did not show Lewis's phone near the scene of the murder.

Facebook messages between Dorell and Lewis showed discussion of rent payments, Lewis inquiring about a divorce lawyer, and, on the night of September 19, Dorell telling Lewis the garage door was open.

From Google, the State offered and the court admitted Lewis's internet searches from June 19, July 16, and September 20 through 21, 2017. On June 19, Lewis searched for directions to Canales's home. Records also showed Lewis's phone traveling to Canales's residence the same day, following the Google recommended route. On July 16, Lewis searched for "Panthers player who killed his wife." Between September 20 and 21, Lewis searched for "lynwood shooting today," "everett shooting today," and "everett shooting yesterday." On September 19, 2017, Google location information showed Lewis at his home between 9:46 p.m. to 11:57 p.m. Google location information subsequently showed Lewis at his home between 12:00 a.m. and 1:11 a.m. on September 20, 2017. At approximately 1:13 a.m., Google records showed Lewis's phone moving away from his residence until 1:15 a.m. Between 1:15 a.m. and 1:35 a.m., there is a gap in the Google location information, indicating the phone was either turned off or

placed in airplane mode. Google location records later showed Lewis's phone between 5:06 a.m. to 5:21 a.m. on September 20 near his home.

From Snapchat, the State offered and the court admitted two of Lewis's conversations. The first conversation occurred on August 8, 2017 and was between Lewis and an unnamed individual. Lewis was describing what he wants in a woman. He concluded by stating, "You have to workout with me. And go on bike rides. And sporting events. If I need you to hide a body you don't even have to ask any questions. I'm being dead ass serious about the last one." The second conversation was between Lewis and Phelps; however, the messages did not relate to the homicide.[4]

Last, the State offered and the court admitted Lewis's Key Bank monthly credit card statements from May 21, 2017 to January 20, 2018. It also offered Key Bank account statements showing deposits and withdrawals from May 2017 to December 2017. The State offered and the court admitted Lewis's Bank of America monthly statements from May 2017 to October 2017, as well as copies of deposit slips or checks that were cashed during that time period. The Key Bank and Bank of America records were shown in a presentation used during Betts's testimony to illustrate it was possible for Lewis to save $2,400.00 in cash to pay Phelps for the murder.

Some of this evidence is incriminating, particularly Lewis's internet search for "Panthers player who killed his wife" and the location information suggesting

---

[4] Our record is not clear on whether the latter Snapchat conversation was obtained from Lewis's or Phelps's records. We assume for purposes of our decision that it was obtained from Lewis's.

his phone moving together with Phelps and Hale at 1:13 a.m. on September 20, 2017, along with the phone being disabled during the time their vehicle left Lewis's residence and then returned to it. However, other than the extent to which he challenges Lee's report of hearsay by Hale, Lewis does not challenge the evidence described in section I above. Similarly, we have concluded the trial court did not err in admitting the evidence described in sections II A-D above. Given the untainted and properly admitted evidence described above, any reasonable trier of fact would have reached the same result in the absence of evidence from the challenged warrants.

The untainted evidence showed Lewis had motivation to injure Canales based on past and escalating assaults. Lewis threatened to kill her in terms she perceived as serious at the time. Lewis tied his threat to rulings in anticipated family court proceedings, which later went against him within a month before the murder. Lewis made at least two trips to Canales's residence. Canales was provably fearful to a degree supporting a protection order. Lewis was noticeably distracted the evening of the murder. Phelps and Hale drove from Spokane directly to Lewis's residence, arriving at 1:10 a.m. when a person from the residence entered their vehicle without any conversation. The only residents of the household at the time were Lewis, his mother, his sister, and his renter. Minutes later, the same vehicle was recorded traveling past a business in the direction of Canales's, then the vehicle returned to Lewis's residence to drop off the person it had picked up, then it again passed the business in the direction of Canales's, and only minutes later the shooting was reported to 911. Phelps's

29

inquiry about the presence of children, he said at Hale's request, implied a level of recognition that a domestic dispute underlay the killing. A nine millimeter gun was used, corresponding to the one Hale's mother purchased and later could not find. The physical evidence of the shooting matched Phelps's description. The camera at the local business showed Phelps and Hale returning toward Canales's residence to look for the lost glove. Phelps's phone records showed his phone accessing data near Canales's residence so that he could obtain GPS directions back to Spokane. Phelps posted to Snapchat showing he had received $2,400.00 in cash, and Lewis's renter gave testimony suggesting Lewis had recent access to at least $1,100 in cash from two monthly rent payments. The only connection between Phelps and Canales in the evidence was through Lewis. The only motive to kill anyone in Canales's residence was Lewis's stated one. When confronted that morning, Lewis did express surprise at learning that Canales was out of town, but expressed none at the news there had been a shooting at the house his children were at that night. The defense closing argument conceded it was Lewis in the video getting into Phelps's car, explaining when Lewis denied leaving his house that night, he "lied to the police." And Phelps confessed to the entirety of his role, pleading guilty to first degree murder. Based on this evidence, any reasonable trier of fact would reach the same result. If there was any error in allowing evidence from the challenged warrants, it was harmless given the overwhelming untainted evidence.

F

Lewis argues the trial court erred in admitting Hale's hearsay statements to Lee about the murder. We agree, but conclude the admission of these statements was harmless.

The State elicited testimony from Lee that sometime in August or September 2018, she was at a pool party with a person she knew as Angie. The parties do not dispute that the person Lee knew as "Angie" was Hale. The two were talking when "all of a sudden, [Hale says], 'Can I tell you something that you can't tell anybody?' " Lee testified she remembered Hale saying that Phelps's uncle wanted Phelps to take out the uncle's "baby mama," and Phelps's uncle offered to pay him $10,000.00. Hale stated she agreed to help, and she and Phelps drove

> to Seattle from Spokane, and she said that they went to [Phelps's] uncle first, and then from [Phelps's] uncle's house, they went to the woman's house. [Hale] went up and knocked on the door while [Phelps] hid around the corner. And when the woman opened the door, [Phelps] came around with open fire.

Lee testified Hale admitted to killing the wrong person; the two accidently killed the sister of the "baby mama." Lee further testified that Hale told her the murder happened in Everett, and the two were paid $2,500.00.

The State contended the statements were not offered to prove the truth of the matter, but to show the reasons the police resumed investigating after they received Lee's tip in September 2018. The trial court denied Lewis's motion to exclude Hale's statements referring to Lewis as "baby daddy" on the ground they were not offered for the truth of the matter asserted.

Hearsay is statement, other than the one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted. ER 801(c). "Whether a statement is hearsay depends upon the purpose for which the statement is offered." State v. Crowder, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). "A statement is not hearsay if it is used only to show the effect on the listener, without regard to the truth of the statement." State v. Edwards, 131 Wn. App. 611, 614, 128 P.3d 631 (2006). In determining whether the statement was offered to prove its truth instead of for a benign purpose as the State asserts, we examine whether the benign purpose was relevant. See State v. Hudlow, 182 Wn. App. 266, 278-80, 331 P.3d 90 (2014). A hearsay statement not offered to prove the truth of the matter asserted is inadmissible under ER 801(c) if the purpose for which it is offered is irrelevant. See State v. Gonzalez-Gonzalez, 193 Wn. App. 683, 690, 370 P.3d 989 (2016); Hudlow, 182 Wn. App. at 278-80.

Based on State v. Chenoweth, the State argues the statements were admissible for the nonhearsay purpose of showing their effect on law enforcement, but this argument is unavailing on the record here. 188 Wn. App 521, 354 P.3d 13 (2015). In Chenoweth, the defendant challenged the admission of testimony that the victim disclosed the sexual assault to witnesses. Id. at 531. The trial court ruled the evidence of the disclosures was admissible to explain how the allegations came to the attention of law enforcement. Id. However, the trial court ruled the testimony would " 'stay absolutely that generic[,] simply to explain to the jury how we g[o]t here, nothing more.' " Id. (alterations in original). The witnesses testified "without reference to any specifics of the allegations. This testimony was not

32

offered for the truth of the allegations, but to show what the witnesses did next and provide a basis for their testimony." Id. at 534 (footnote omitted). This case is distinguishable, because Lee testified specifically about what Hale told her. Because the testimony was not generic, it was error to admit Hale's statements for the purpose the State offered of explaining the reasons for the police's actions.[5]

We analyze the erroneous admission of evidence in violation of an evidentiary rule under the nonconstitutional harmless error standard. State v. Gower, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). Nonconstitutional error is harmless if there is a reasonable probability that, without the error, " 'the outcome of the trial would have been materially affected.' " Gresham, 173 Wn.2d at 433 (internal quotation marks omitted) (quoting State v. Smith 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Even if Hale's statements to Lee had been excluded, Phelps's testimony still would have placed nearly the same information before the jury. There is no reasonable probability that the outcome of the trial would have been materially affected. Any erroneous admission of Hale's hearsay statements was harmless.

G

Lewis argues the trial court erred in permitting testimony from an investigating detective as to Lewis's guilt. We agree the testimony was improper, but conclude it was harmless.

---

[5] In concluding the nonhearsay purpose offered by the State did not support admission of the evidence, we do not consider whether other possible nonhearsay purposes existed.

Fagan responded to the homicide scene and was later tasked with attempting to contact Lewis at his residence. After discussing Fagan's conversation with Lewis, the State inquired about Fagan's continued investigation, including other witnesses, the camera evidence, and the scene of the crime. The State asked about Fagan investigating drive times between Lewis's and Canales's residences to compare with the timing of the car in the video evidence and the 911 call. The State asked whether "[a]t this point were you trying to say[] that [Lewis] was conclusively involved with the homicide? Did you make up your mind that he was involved?" Fagan gave a narrative answer indicating why the police were looking at Lewis as "a potential suspect or person of interest," concluding with a comment about the possibility of parties to a divorce committing violence:

> [Fagan]    At this point we are in the morning hours of the 20th. We don't know who was involved at this point, so any time you have a person that comes up as either a person of interest or a suspect perhaps, you have to develop information that would exclude someone being involved or include them. And typically through the course of an investigation you gather evidence, videos, do interviews, send stuff off to the state lab, do a variety of investigation that can lead to including or excluding. And giving some of the information that we learned from patrol related to [Lewis] and [Canales], there were things to be concerned of that obviously we needed to work through and see if we could exclude him or include him.
>
> [The State]   Specifically why is he a potential suspect or person of interest at this point?
>
> [Fagan]    We knew [Lewis] and [Canales] were in the process of going through a divorce. There was court paperwork related to that. There was paperwork showing [Lewis] had supervised visits, so for lack of a better word, it was a contentious divorce. It was not amicable. It was not something easily working out. There were police incidents that were connected to [Lewis] and/or [Canales], so it became important given that context of what was happening with

34

him. *When there is a homicide, you immediately look at people that are most direct to the victim. In this case would be [Canales-McGuire]. It is the home of [Canales] to see if they had motive or reason to carry this out.*

[The State]   And you said it is common to do that. Why is that?

[Fagan]       Like in a divorce there is a lot of emotion that is wrapped in that one way or another. *Sometimes the emotions get the better of someone and causes them, in this case multiple times to lash those emotions out and have them killed or kill them.*

(Emphasis added.)

At the next break, Lewis's counsel objected to Fagan's statements and asked that there not be further questioning of that nature. The prosecutor indicated the intent of the questioning had been to elicit why law enforcement had been investigating Lewis. The trial court appears to have examined an available real-time transcript to locate the challenged question. The court stated,

I think I have likely the specific question. The question was you said it is common to do that and why it is referring to looking at people associated with the individual victim. And then the detective, and just generally, in a divorce there is a lot of emotion that happens. Sometimes emotions some cause them. So I think I understand the nature of the objection. At this point it is clear it is ultimately for the trier of fact to determine whatever events, and ultimately he is responsible for that. So to the extent the question calls for this type of conclusion, if there was contemporaneous [objection], it would be sustained. The question that was asked doesn't seem to call for that conclusion though.

Lewis did not make a further objection or seek further relief. On appeal, Lewis argues Fagan's statements, emphasized in italics above, expressed an improper opinion on guilt.

In a criminal trial, "[o]pinions on guilt are improper whether made directly or by inference." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014).

35

"Impermissible opinion testimony regarding the defendant's guilt may be reversible error because such evidence violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury." Id. "The trial court has wide discretion to determine the admissibility of evidence, and the trial court's decision whether to admit or exclude evidence will not be reversed on appeal unless the appellant can establish that the trial court abused its discretion." State v. Demery, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).

Testimony by police officers "carries an 'aura of reliability.'" State v. Montgomery, 163 Wn.2d 577, 595, 183 P.3d 267 (2008) (quoting Demery, 144 Wn.2d at 765). Courts have in some cases viewed statements by police officers as "analogous to the prosecutor making statements during trial that [they] thought that the defendant was guilty or untruthful," and have noted that "when a law enforcement officer gives opinion testimony, the jury is especially likely to be influenced by that testimony." Demery, 144 Wn.2d at 762. When a prosecutor asks an appropriate question, nonresponsive testimony offered by a witness that is an improper comment on a criminal defendant's credibility or guilt is subject to being stricken by the court. See State v. Jungers, 125 Wn. App. 895, 902, 106 P.3d 827 (2005).

"Whether testimony constitutes an impermissible opinion on guilt or a permissible opinion embracing an 'ultimate issue' will generally depend on the specific circumstances of each case, including the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact." City of Seattle v. Heatley, 70 Wn.

36

App. 573, 579, 854 P.2d 658 (1993).  "[T]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." Id. at 578.  In Quaale, an answer by a state trooper in a driving under the influence case stating, "Absolutely.  There was no doubt [the defendant] was impaired," was an improper opinion on guilt because it "went to the core issue and the only disputed element."  182 Wn.2d at 195, 200.  In Montgomery, an officer testified, " 'I felt very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes.  I'd seen those actions several times before.' "  163 Wn.2d at 587-88.  This, among other statements, was an improper opinion on guilt because it "went to the core issue and the only disputed element."  Id. at 594.

Here, the State asked why Fagan sought to determine drive times between Lewis's residence and Canales's residence when he did, the day after the homicide.  It was relevant to elicit Fagan's explanation for investigating the drive times when he did, given the lack of other evidence implicating Lewis at that time. Fagan's answer explained a reasonable justification for pursuing that investigation at that time to the extent he referred to what was then known about the acrimony of the dissolution proceedings, police incidents, the practice of looking at those persons "most direct" to the victim, and the fact of emotions running high in family law disputes.

However, after stating the general proposition that people may act on their emotions, Fagan made further statements, that "[i]t is the home of [Canales]" and "*in this case* multiple times to lash those emotions out and *have them killed.*" (Emphasis added.) Those statements went beyond facts justifying further investigation known at the time of the homicide and were specific to the State's theory against Lewis. They tied Fagan's statements concerning the general potential for criminal acts in the context of family law disputes to the State's specific theory against Lewis. To that extent, Fagan's statements amounted inferentially to an improper opinion on guilt.

An improper opinion on guilt may violate the defendant's constitutional right to have a fact critical to guilt determined by the jury, but is subject to harmless error analysis. Quaale, 182 Wn.2d at 201-02. Constitutional error is harmless "only if the State establishes beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error." Id. at 202. In the context of whether an opinion on guilt was a manifest constitutional error that could be raised for the first time on review under RAP 2.5(a)(3), the court has said, "Important to the determination of whether opinion testimony prejudices the defendant is whether the jury was properly instructed." Montgomery, 163 Wn.2d at 595. The court has considered in this determination whether "the jury was properly instructed . . . jurors 'are the sole judges of the credibility of witnesses,' and that jurors 'are not bound' by expert witness opinions." Id. (internal quotation marks omitted) (quoting State v. Kirkman, 159 Wn.2d 918, 937, 155 P.3d 125 (2007)). With a proper instruction, improper opinion testimony is less likely to prejudice the

outcome when it is cumulative of other evidence of guilt. See State v. Thompson, 90 Wn. App. 41, 47, 950 P.2d 977 (1998). In Montgomery, the Supreme Court suggested direct opinions on guilt are more likely to be prejudicial than inferential opinions, stating, "[I]t is very troubling that the testimony in this case was quite direct and used explicit expressions of personal belief." 163 Wn.2d at 594

In this case, there was no contemporaneous objection. This suggests the comment was not viewed as significant at the time it was made. Additionally, the subject matter of the questioning was directed to general reasons to investigate Lewis, and the majority of Fagan's answers spoke to those general reasons. Lewis did not ask for any relief at trial other than that similar questions not be asked in the future. This request was honored. Fagan's statements were not direct opinions that Lewis was connected to the homicide. Furthermore, Fagan's testimony apart from these brief comments generally followed the outline of the State's case against Lewis. Finally, the jury was instructed they were the sole judges of credibility and were not required to accept expert opinion. Fagan's brief reference to the State's theory in the context of explaining what the police knew at successive times did not meaningfully suggest a conclusion of guilt more so than the circumstances as a whole did. Any error in the admission of Fagan's statements was harmless.

III

Lewis argues he received ineffective assistance of counsel in several respects. We disagree.

The federal and state constitutions guarantee an accused person the right to effective assistance of counsel, subject to a two prong test established in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To demonstrate ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, defined as falling below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defendant, determined by whether there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. Strickland, 466 U.S. at 687-88, 694.

We begin with a strong presumption that counsel's representation was reasonable. Estes, 188 Wn.2d at 458. This court presumes adequate representation if there is any " 'conceivable legitimate tactic' " that explains counsel's performance. In re Det. of Hatfield, 191 Wn. App. 378, 402, 362 P.3d 997 (2015) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). The reasonableness of counsel's performance is evaluated from " 'counsel's perspective at the time of the alleged error and in light of all the circumstances.' " In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance. In re Pers. Restraint of Lui, 188 Wn.2d 525, 539, 397 P.3d 90 (2017).

Prejudice exists if there is a reasonable probability that "but for counsel's deficient performance, the outcome of the proceedings would have been different." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "Reasonable probability" in this context means a probability sufficient to undermine confidence in the outcome. Estes, 188 Wn.2d at 458. A defendant must affirmatively prove prejudice, not simply show that " 'the errors had some conceivable effect on the outcome.' " State v. Crawford, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006) (quoting Strickland, 466 U.S. at 693).

Lewis first argues his counsel was ineffective in failing to object to the Google and Snapchat warrants. As discussed above, assuming the evidence from those warrants should have been suppressed, any error was harmless. For the same reason, Lewis cannot show that he was prejudiced by any failure by his counsel to challenge these warrants. An appellate court need not consider both prongs of Strickland if a claim of ineffective assistance of counsel fails on one. In re Pers. Restraint of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012).

Next, Lewis argues his counsel was ineffective in proposing a flawed ER 404(b) limiting instruction, and then declining an instruction altogether. We disagree. Lewis's counsel explained the defense strategy in seeking an alternative limiting instruction to that contemplated by the pattern jury instructions. The defense felt there was so much ER 404(b) evidence admitted that it would be counterproductive to have a proper instruction listing the evidence and the purposes for which it could be considered. Not requesting a limiting instruction for evidence admitted under ER 404(b) may be a legitimate trial tactic to avoid

reemphasizing damaging evidence. State v. Yarbrough, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009); State v. Barragan, 102 Wn. App. 754, 762, 9 P.3d 942 (2000); State v. Donald, 68 Wn. App. 543, 551, 844 P.2d 447 (1993). Lewis does not rebut the presumption of reasonable performance.

Additionally, Lewis does not establish prejudice. The other acts established through the ER 404(b) evidence were not similar to the charged crime of planning a contract murder. Had a limiting instruction been given, and the jury been prohibited from considering the evidence for the purpose of showing Lewis's character and action in conformity with that character, the remaining overwhelming evidence of Lewis's guilt shows the outcome would not have been different.

Next, Lewis claims his defense counsel was ineffective in failing to object to Westvold-Naekel's testimony concerning Lewis's interaction with his children at the September 19, 2017 supervised visit. The section dedicated to this assignment of error in Lewis's opening brief is a conclusory statement that counsel was deficient. Lewis does not address the issue in his reply brief. It is not possible to reach the merits of this issue where Lewis fails to cite to the record or provide legal authority supporting his argument. Westvold-Naekel's observations of Lewis's demeanor in the hours before the murder were admissible, and Lewis does not show any specific objection would have been sustained if made. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." Holland v. City of Tacoma, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

Next, Lewis argues defense counsel's failure to request a limiting instruction for Hale's hearsay statements was unreasonable because it permitted the jury to consider Hale's hearsay statements as substantive evidence. At a pretrial hearing, the trial court granted the State's motion to admit Hale's statements and stated, "[I]f the defense proposes a limiting instruction, I in all likelihood am inclined to give that." However, defense counsel did not propose such an instruction and Lewis claims this constitutes deficient performance. Here too, it was a reasonable tactical decision to not request a limiting instruction and avoid reemphasizing Hale's statements.

Lewis also does not establish prejudice. Even if the jury was instructed to consider Hale's statements for a limited purpose, the outcome of the trial would not have been different. Phelps testified that Lewis hired him to kill Canales. This and other evidence described above shows the outcome would not have been different if an instruction had limited the jury's consideration of Hale's statements.

Last, Lewis argues defense counsel provided ineffective assistance in failing to advance an open door theory for the admission of hearsay evidence that Lewis was told Canales was out of town. The State moved in limine to exclude hearsay statements of one of Lewis's children. It was represented the child told their nanny that she told Lewis that Canales was out of town and that Canales-McGuire was staying with them. The State argued that if asked of the nanny, the statement was inadmissible hearsay. The trial court granted the motion to exclude the statement.

During Canales's direct examination, the State elicited the following testimony:

> [The State]    And had you discussed the fact that you were going on a business trip with anyone?
> [Canales]    My family.
> [The State]    And who, specifically, in your family that you can recall?
> [Canales]    Well, definitely [Canales-McGuire].  My parents.  And I think my other siblings also.
> [The State]    Were any of them having contact with [Lewis] during that period of time to your knowledge?
> [Canales]    Not to my knowledge.

Canales further testified she did not convey to Lewis that she was going to be gone, nor was she aware of anyone else who would have told him.

"A party may open the door to otherwise inadmissible evidence by introducing evidence that must be rebutted in order to preserve fairness and determine the truth."  State v. Wafford, 199 Wn. App. 32, 36-37, 397 P.3d 926 (2017).  When a party opens the door to a subject, the opposing party may request admission of previously excluded evidence on that subject during cross or redirect examination.  State v. Gefeller, 76 Wn.2d 449, 455, 458 P.2d 17 (1969), overruled on other grounds by State v. Hill, 123 Wn.2d 641, 870 P.2d 313 (1994)).  The doctrine "permits a court to admit evidence on a topic that would normally be excluded for reasons of policy or undue prejudice when raised by the party who would ordinarily benefit from exclusion."  State v. Rushworth, 12 Wn. App. 2d 466, 473, 458 P.3d 1192 (2020).  However, "[e]vidence is still subject to possible exclusion based on constitutional requirements, pertinent statutes, and the rules of evidence."  Id. at 474.

The State elicited testimony Canales was unaware of anyone having told Lewis she was gone. Canales did not testify that no one told Lewis she was gone. This does not open the door to the child's statement because Canales had no knowledge and did not testify that no person told Lewis she would be gone.

Additionally, the child's statement was inadmissible because it was hearsay. Even if the State had broached a subject allowing Lewis to prove a fact to put the State's evidence in a fair context, Lewis still would have needed to prove the fact through admissible evidence. In this case, the child's statement was excluded because it was hearsay. If Lewis had had admissible evidence that he was told Canales would be out of town, he could have sought to present such evidence regardless of whether the State first put on evidence that he had not been told. Defense counsel was not deficient in failing to argue that the State opened the door. Lewis also does not establish prejudice, because there is not a reasonable probability that the outcome of the proceedings would have been different had counsel pursued an open door theory.

IV

Lewis argues the trial court "erred in failing to give Lewis's proposed instruction on first degree manslaughter as a lesser offense of aggravated first degree murder." Lewis contends a jury could have concluded Lewis was merely reckless towards the possibility that Phelps would kill based on Lewis's request, as related by Phelps, that Phelps get Canales " 'out of the way.' " We disagree.

During cross-examination, Phelps agreed he "assumed" he knew what Lewis meant:

> [Defense Counsel]  Okay.  And is it fair to say, [Phelps], that you assumed that the language "get somebody out of the way" meant that that person was to be killed?
> [Phelps]      Yes.
> [Defense Counsel] Did you ever seek clarification from [Lewis] and perhaps send him a Snap back and say, "You want me to kill somebody?"?
> [Phelps]      I didn't.

Phelps described this as his understanding of his conversation with Lewis:

> [Defense Counsel]  . . . . So this morning when you testified that there were a lot of assumptions that were made in this case, were there assumptions made about what you were supposed to do? Or were you just thinking that you and [Lewis] were speaking the same language?  Or can you explain that, please?
> [Phelps]      You know, I—I assumed that there was no clarification needed.  I thought, you know, we pretty much were on the same page.  That's why I didn't ask what he meant when he asked to get someone out of the way.  I thought it was understood what I was going over there to be done.  And that's the assumption, I guess, that I made.

Lewis proposed an instruction on first degree manslaughter based on the possibility of the jury concluding Canales-McGuire's death was the result of reckless conduct by Lewis.

In preliminarily assessing the parties' arguments on whether the evidence justified a manslaughter instruction, the trial court focused on Lewis's participation in events evolving over time:

> When I'm looking at this case and the evidence that's been presented, it is the totality of what is here in front of the trier of fact. So it is the exclusion of the greater that I'm struggling with, and I do think it goes back to, at least as I sit here at the moment, it is the issue of the car.  It is the issue of what happened that evening.  It is

> not just simply one text message. It is not just simply one conversation. It is at least something of a course of conduct.
>
> Many of these lesser included cases are just a moment in time factually. They are not things that evolve over a series of days, weeks, or even months.

In reiterating its initial assessment, the trial court again emphasized there being "much more" than just an "offhand comment" attributed to Lewis. The trial court ruled it would not give the manslaughter instruction.

"The statutory right to lesser included offense instructions 'protect[s] procedural fairness and substantial justice for the accused.' " State v. Avington, 2 Wn.3d 245, 258, 536 P.3d 161 (2023) (alteration in original) (quoting State v. Coryell, 197 Wn.2d 397, 412, 483 P.3d 98 (2021)). It ensures that "juries considering defendants who are 'plainly guilty of some offense' do not set aside reasonable doubts in order to convict them and avoid letting them go free." State v. Henderson, 182 Wn.2d 734, 742, 344 P.3d 1207 (2015) (quoting Keeble v. United States, 412 U.S. 205, 212-13, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973)). In Washington,

> a defendant is entitled to an instruction on a lesser included offense if two conditions are met. First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed.

State v. Workman, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978) (citations omitted). These two conditions are referred to as the "legal prong" and the "factual prong" of the Workman test. Avington, 536 P.3d at 168. The trial court ruled that first degree manslaughter is a lesser included offense of first degree murder. Lewis's appeal implicates only the factual prong of Workman.

47

Coryell explained,

> [A] defendant is entitled to a lesser included instruction based on the evidence actually admitted. A defendant is not entitled to a lesser included instruction merely because a jury could ignore some of the evidence. The factual prong of *Workman* is satisfied only if based on some evidence admitted, the jury could reject the greater charge and return a guilty verdict on the lesser.

197 Wn.2d at 406-07. The court said, "the factual requirement for giving a lesser or inferior degree instruction is that some evidence must be presented—from whatever source, including cross-examination—that affirmatively establishes the defendant's theory before an instruction will be given." Id. at 415. "In cases where there is relevant 'conflicting evidence, this evidence presents a question of fact for the jury,' which is the sole judge of the weight and credibility of the testimony and other evidence at trial." Avington, 536 P.3d at 169 (quoting Coryell, 197 Wn.2d at 414). The evidence does not need to exclude the greater charged crime. Coryell, 197 Wn.2d at 417, 418-19.

In Coryell, the court described the manner in which a court must view the evidence when evaluating the factual prong of Workman:

> Defendants are entitled to the benefit of all the evidence presented at trial, regardless of whether they were the introducing party. See [11 Washington Practice: Washington Pattern Jury Instruction: Criminal] 1.02 [4th ed. 2016]. When the appellate court determines if the evidence at trial is sufficient to support an instruction, it views the "supporting evidence in the light most favorable to the party that requested the instruction." [State v. ]Fernandez-Medina, 141 Wn.2d at 455-56, 6 P.3d 1150 [2000]. If the evidence permits a jury to rationally find a defendant guilty of the lesser offense, a lesser included offense instruction should be given. Beck v. Alabama, 447 U.S. 625, 635, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). Generally, a defendant may argue inconsistent defenses if the defenses are supported by evidence. State v. Frost, 160 Wn.2d 765, 772, 161 P.3d 361 (2007). Although the evidence must affirmatively establish

> the defendant's theory of the case, it is not enough that the jury might disbelieve the evidence pointing to guilty. [State v. ]Fowler, 114 Wn.2d at 67, 785 P.2d 808 [(1990), overruled on other grounds by State v. Blair, 117 Wn.2d 479, 486-87, 816 P.2d 718 (1991)]. The court typically "err[s] on the side of instructing juries on lesser included offenses." [State v. ]Henderson, 182 Wn.2d at 736, 344 P.3d 1207 [2015].

197 Wn.2d at 415 (one alteration in original). "[T]he fact-intensive inquiry required by the factual prong is 'often complicated' to apply in practice." Avington, 536 P.3d at 169 (quoting Coryell, 197 Wn.2d at 406). A trial court's decision based on a factual determination applying Workman is reviewed for abuse of discretion. Avington, 536 P.3d at 169; Coryell, 197 Wn.2d at 405.

To establish first degree murder, the State was required to prove that "[w]ith a premeditated intent to cause the death of another person," Lewis "cause[d] the death of such person or of a third person." RCW 9A.32.030(1)(a). A person acts with "intent" when the person "acts with the objective or purpose to accomplish a result which constitutes a crime." RCW 9A.08.010(1)(a). A person commits first degree manslaughter when the person "recklessly causes the death of another person." RCW 9A.32.060. This requires that the State "show [a defendant] '[knew] of and disregard[ed] a substantial risk that a [*homicide*] may occur.' " State v. Gamble, 154 Wn.2d 457, 467, 114 P.3d 646 (2005) (most alterations in original) (quoting RCW 9A.08.010(1)(c)). The issue is whether there was affirmative evidence from which a jury could conclude that Lewis disregarded a substantial risk that a homicide may occur, and did not act with the premeditated objective to accomplish that result.

49

In Coryell, the State charged second degree assault, which required that it prove assault by strangulation, and the defendant sought an instruction on fourth degree assault, which required only that the State prove assault. 197 Wn.2d at 404, 415-16. Recognizing the defendant's prerogative to present alternative defenses, the court pointed to affirmative evidence establishing fourth degree assault without strangulation: "Although Coryell stated that he was not with Hart'Lnenicka in the laundry room, if the jury found that there was an assault in the laundry room, then he was entitled to the inference that he was guilty only of fourth degree assault based on the police officer's testimony that he saw no petechial hemorrhaging." Id. at 417. Further, there was evidence supporting one continuous event, not two separate assaults, which would have supported the jury in concluding marks on the victim's neck came from earlier physical contact, not strangulation. Id. It was error to refuse the instruction, because the evidence "supported an inference that Coryell assaulted, but did not strangle, his girlfriend, and thus, he was entitled to a lesser degree instruction." Id. at 418.

Here, the trial court distinguished Coryell. It is appropriate for this court to "consider the trial court's remarks in the context of the charged offenses and the undisputed evidence presented at trial." Avington, 536 P.3d at 171. The trial court here focused on the intentionality of Lewis's actions over time, which was not consistent with recklessness. The evidence included (1) Lewis's past assaults on Canales, (2) Lewis's threat to kill Canales, (3) communication by Phelps concerning Phelps's acquiring a gun and a partner, (4) Lewis's request that an "O[riginal]G[angster]" and later Phelps "get [Canales] out of the way," (5) meeting

50

Phelps and Hale to direct them to Canales's residence, (6) showing them a photo of Canales, (7) paying $2,400.00, (8) Lewis's surprise when informed Canales had been out of town, (9) Lewis's untruthful claim he had remained home all night, and (10) his neglect to ask after his children's or anyone's safety despite being told there had been a shooting. There is no affirmative evidence of Lewis having a reckless mental state. Phelps's testimony that Lewis requested he "get [Canales] out of the way," even if subject to differing interpretations, is not affirmative evidence that Lewis subjectively disregarded a risk that homicide might occur. "[I]t is not enough that the jury might disbelieve the evidence pointing to guilty." Coryell, 197 Wn.2d at 415. The trial court did not abuse its discretion in declining a manslaughter instruction.

V

Lewis argues the trial court erred in denying his motion to dismiss the charges due to governmental misconduct under CrR 8.3(b). Lewis argues, generally, that government mismanagement in the form of discovery and other delays forced Lewis to choose between his right to a speedy trial and his right to effective assistance of counsel. We conclude Lewis did not show governmental misconduct.

Following the tip police received from Lee in September 2018, police obtained search warrants in four sets between January 2, 2019, and July 24, 2019. Authorities arrested Hale on April 4, 2019. They arrested Phelps on April 5, 2019. That day, Phelps admitted his role in the murder and stated Lewis had approached him to kill a person Lewis described as his ex-wife. On April 6, 2019, Lewis, then

51

in the Snohomish County Jail, declined to talk about the homicide investigation. Lewis was arraigned on April 11, 2019. Over the next several months, the trial court ordered several continuances as law enforcement continued to gather evidence and convey the same to defense counsel.

On May 9, 2019, the trial court set the hearing for the first motion to continue on May 23, 2019.

On May 17 & 22, 2019, the State produced to the defense 9 and 38 discs of discovery production.

On May 23, 2019, the trial court ordered a Campbell[6] continuance over Lewis's objection. The prosecutor was in the process of reviewing 1,500 pages on one disc not yet provided to the defense, and there were "about 28 more discs to go to be provided." There was "a significant amount of information still coming in from law enforcement." Defense counsel indicated it was a slow process to review the discovery with the defendant due to the need for redactions, but counsel stated, "[I]t's very critical that every piece of discovery is reviewed" with Lewis. Counsel represented, "[I]f the Court ordered that this matter was to proceed to trial on May 31st, I could not provide effective representation to [Lewis]." The trial court re-set trial to November 15, 2019.

---

[6] State v. Campbell, 103 Wn.2d 1, 13-15, 691 P.2d 929 (1984) (allowing continuance over defendant's objection where "Campbell's counsel could neither effectively represent him nor ensure that he received his constitutional right to a fair trial within 60 days of arraignment, 'through no fault of their own but because of the complexity and length of this case.' ").

On November 6, 2019, the trial court ordered a further continuance. The prosecutor represented,

> We have been working diligently to get discovery to defense. There have been a number of records, thousands of pages of records, that we have retained from outside sources. Some of them we were having difficulty getting opened, and I wanted to make sure all of that was functioning and working when we turned it over to defense. I have actually given [defense counsel] a whole folder worth of discovery today that includes thousands of pages of discovery that she's going to need to go through in order to prepare for trial.
> We still have defense interviews to do. We still have a large amount of investigation to be done, I think, for both parties to prepare for trial. And so we're asking the Court to continue this matter until October 2nd for all of those reasons. [Lewis] is objecting to the continuance.
> I have advised [defense counsel] that I am in agreement that a continuance is necessary here.

Trial was set for October 2, 2020. This was at defense counsel's request and over defendant's objection.

Afterwards, there were further continuances Lewis describes on appeal as being "due to defense counsel's unavailability and several pre-trial motions were litigated." Lewis's later motion to dismiss provides additional detail concerning some of these continuances:

On June 23, 2020, the trial date was continued one week, and the court scheduled a pretrial hearing to rule on the State's ER 404(b) evidence.

On September 4, 2020, according to Lewis's motion, the "[d]efense expressed concerns of transporting [Lewis] to court, given a positive COVID-19 defendant" at the court.

On October 1, 2020, a new trial date was set for March 5, 2021.

53

The trial court held three significant pretrial hearings. On October 15, 2020, the court held a hearing to determine the admissibility of the State's disclosed ER 404(b) evidence. On December 21, 2020, the court held a CrR 3.5 hearing. On January 14, 2021, the court held a CrR 3.6 hearing.

On January 27, 2021, Lewis moved to dismiss under CrR 8.3(b). The motion notes Lewis was in custody serving his sentence for the assault convictions. In discussing prejudice to his right to a fair trial, Lewis focused almost entirely on the consequences of COVID-19. He argued, "During the delay, the COVID-19 pandemic hit the United States," as a result of which he would be "forced to go to trial as a black man in a mask" and "[w]itnesses will likewise be masked." He referred to COVID-19's consequences on evaluating demeanor, fear of transmission affecting jury service, jurors' ability to hear through plexiglass installations, handling exhibits and evidence, jurors' worry for their own physical safety, COVID-19's allegedly depressing participation of minorities in jury service, limited and remotely conducting voir dire, and a concern for limited peremptory challenges.[7]

At the same hearing, after the court denied the motion to dismiss, the parties turned to the issue of a further continuance. The State indicated it did not believe the case would be ready for trial by the existing trial date of March 5, 2021. Defense counsel indicated that in discussions with the State she had continually stated she lacked Lewis's permission to discuss a continuance, but having anticipated the trial court's concerns addressed her own upcoming unavailability,

---

[7] Later at trial Lewis was afforded his usual six peremptory challenges.

defense interviews not yet completed, and matters that would require pretrial litigation including the phone and social media records being gathered by the State and its anticipated trial exhibits. The trial court set the case to be called for trial on October 15, 2021, subject to a formal continuance order. The trial court went on to hear motions in limine starting on October 14, 2021, start jury selection on October 18, 2021, and empanel the jury on October 25, 2021.

CrR 8.3(b) provides, "The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." To support dismissal under CrR 8.3(b), the defendant must show by a preponderance of the evidence both (1) arbitrary action or governmental misconduct, and (2) actual prejudice affecting the defendant's right to a fair trial. State v. Martinez, 121 Wn. App. 21, 29, 86 P.3d 1210 (2004). The misconduct need not be of an evil or dishonest nature, but simple mismanagement is sufficient. State v. Michielli, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997). Dismissal under CrR 8.3(b) is an extraordinary remedy that is improper except in truly egregious cases of mismanagement or misconduct that materially prejudice the rights of the accused. Martinez, 121 Wn. App. at 30. This court reviews a CrR 8.3(b) ruling for abuse of discretion, which will be found when a decision is manifestly unreasonable or based on untenable grounds. Id.

"In the dismissal context, a defendant is prejudiced when delayed disclosure interjects 'new facts' shortly before litigation, forcing him to choose between his

right to a speedy trial and to be represented by an adequately prepared attorney." State v. Salgado-Mendoza, 189 Wn.2d 420, 432, 403 P.3d 45 (2017) (quoting State v. Price, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)). The criminal rules impose a continuing obligation on the prosecutor to reasonably seek the disclosure of discoverable information not in his or her control, and if the information could not be obtained the prosecutor should notify the court. Id. at 430 (citing State v. Blackwell, 120 Wn.2d 822, 832, 845 P.2d 1017 (1993)).

In Salgado-Mendoza, a driving under the influence case, the State disclosed nine potential toxicologists five months in advance of trial, without specifying which would testify. 189 Wn.2d at 425. The day before trial, the State narrowed the list to three potential toxicologists. Id. The morning of trial, the State identified the toxicologist it would call, with the prosecutor indicating the information had been received that morning. Id. The court said the State "did not live up to its discovery obligations," and this was "likely" governmental misconduct. Id. at 433. The court went on to conclude there was no prejudice. Id. at 435.

In State v. Dailey, 93 Wn.2d 454, 458, 610 P.2d 357 (1980), the trial court dismissed a prosecution under CrR 8.3(b) based on numerous incidents of prosecutorial mismanagement. Charging the defendants with negligent homicide arising out of a traffic fatality, the State initially did not specify whether it believed Dailey or his codefendant was the driver of the vehicle. Id. at 455. For more than a month, with no reasonable explanation, the State delayed providing information and laboratory reports the trial court had ordered disclosed. Id. The Friday before trial the following Monday, the State added 11 new witnesses in addition to the five

it had originally disclosed. Id. at 456. The trial court offered the State the option to try the case with the original five witnesses, and, when the State refused, dismissed the case. Id. The Supreme Court held dismissal was not an abuse of discretion given this combination of circumstances. Id. at 459.

In Martinez, the State's case turned in part on the identification of a gun used in the charged robbery. 121 Wn. App. at 24-25. Although it was not disclosed to the defense at the time, before trial "the State knew . . . that the silver gun identified by Ms. Reinmuth could not have been the same gun shown to her by Mr. Martinez." Id. at 25. For the first time during trial, the evidence disclosed to the defense that the gun from the robbery was clearly a different one from the one that Martinez had possessed per witness Reinmuth's statement. Id. at 27. "Incredibly, even after the revelation that the gun identified by Ms. Reinmuth could not have been the same gun used in the robbery, the State again tried to suggest a connection between them." Id. at 28. After the jury deadlocked 10-2 to acquit, the trial court declared a mistrial and, following amended charges filed by the State, dismissed pursuant to CrR 8.3(b) because of governmental misconduct. Id. at 29.

We affirmed, explaining the State had strategically withheld exculpatory evidence until during trial, apparently in the hope that a witness might testify in a manner diminishing the evidence's exculpatory character. Id. at 32-33, 36. We held the State's failure to reveal exculpatory evidence was a violation of due process and was "egregious enough" to satisfy the first requirement of CrR 8.3(b). Id. at 34. We also found prejudice, given that "[t]he State prosecutor's withholding of exculpatory evidence until the middle of a criminal jury trial is likewise so

repugnant to principles of fundamental fairness that it constitutes a violation of due process." Id. at 35.

Lewis further cites State v. Brooks, in which "the State failed: to provide a 60-page victim's statement until the day before trial; to provide Jason Brooks's statement to a deputy from the night of the incident; to provide the lead detective's report, which likely would have revealed other witnesses that Natalie and Jason needed to interview; and to subpoena the victim for trial." 149 Wn. App. 373, 376, 203 P.3d 397 (2009). This court affirmed the trial court's conclusion of governmental misconduct. Id. at 391. Brooks was marked by serial delays by the State to provide information in its possession, and, according to the trial court, " '[d]umping' " information on the defense " 'on the day of trial when it was not newly created or discovered and which had been available for weeks.' " Id. at 387. The timing of and omissions from the State's disclosures undermined defense counsel's ability to interview the State's investigator and prepare for trial in a timely fashion. Id. at 390.

In State v. Sherman, the State charged the defendant with one count of theft in the first degree, alleging that she had stolen money from her employer. 59 Wn. App. 763, 765, 801 P.2d 274 (1990). On April 14, 1989, the trial court ordered the State to produce, among other things, all records relating to certain employment "submitted by the employer to the Internal Revenue Service [IRS]." Id. On July 11, the day after trial was supposed to have commenced, the State sought reconsideration. Id. By July 20, at trial, the State had never provided the records. Id. at 766. Based on this and other reasons, the trial court dismissed the case. Id.

We held the State's failure to produce the records was a sufficient reason supporting dismissal, explaining "the State agreed to undertake production of the IRS records of the complaining witness. In spite of this agreement, the State failed to produce the records, and then waited until the day after trial was to have begun to seek reconsideration of the order." Id. at 768.

Lewis did not show misconduct as found in these authorities. Lewis did not show the State failed to comply with an order to produce discovery, similar to the order to produce information and laboratory reports in Dailey, or the order to produce IRS documents in Sherman. Lewis did not show the State surprised him with new information on the eve of trial, as in Salgado-Martinez, Dailey, and Brooks, or during trial, as in Martinez. And Lewis did not show the State failed to timely produce information that it had, but inexplicably delayed producing, as the State did in Dailey, Martinez, and Brooks.

Rather, focusing on the schedule on which the State turned over information, Lewis overlays the discussions in Salgado-Mendoza and Blackwell to the effect the State's discovery obligation includes the responsibility to make reasonable efforts to obtain discoverable information not in the prosecutor's control. Lewis argues "there is . . . no evidence that the State used its best efforts to work with Detective Betts and get him to produce his police report in a timely manner." The prosecutor's office's obligation to obtain information it does not directly control is to make reasonable efforts, and then notify the court if it cannot obtain the information. Salgado-Mendoza, 189 Wn.2d at 430. Lewis established that law enforcement was gathering information in its efforts to locate evidence that

Lewis was involved in the murder. But Lewis did not establish that the prosecutor's office was unreasonable in failing to make those efforts occur more swiftly than they did. Further, the prosecutor did notify the court that there was additional information being obtained by law enforcement that his office and defense counsel would need to review. The prosecutor stated at the November 6, 2019 continuance hearing: "There have been a number of records, thousands of pages of records, that we have retained from outside sources." Finally, in Brooks, the failure of the deputies to prepare more timely reports was one failure among many justifying dismissal, and the trial court's and this court's concern was not with the delay alone, but the lack of any reasonable explanation for the delay, and its occurring on the eve of trial. 149 Wn. App. at 381-82, 386-87. The trial court did not abuse its discretion in ruling Lewis did not show governmental misconduct under CrR 8.3(b) and in denying his motion to dismiss.[8]

VI

Lewis argues the combined errors of the trial court and defense counsel are prejudicial in the aggregate. We disagree. Under the cumulative error doctrine, this court may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant their right to a fair trial, even if each error standing alone would be harmless. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome. Id. Having reviewed the evidence

---

[8] Additionally, to the extent Lewis seeks to justify dismissal based on delay in the time to trial, he was required to show a violation of CrR 3.3, a statute, or the state or federal constitution, none of which was shown. See CrR 3.3(h).

Lewis does not challenge on appeal, having concluded that several of the challenged rulings were not error, and assuming without deciding that the trial court should not have admitted evidence obtained through the challenged warrants, Hale's hearsay statements, and Fagan's testimony amounting to an inferential opinion on guilt, the cumulative error doctrine does not afford Lewis relief. Compared to the extensive, unchallenged and untainted evidence, any errors are few and could have had no effect on the outcome.

VII

Lewis argues the imposition of a lifetime no-contact order barring contact with his children should be remanded because the trial court did not sufficiently weigh his fundamental right to parent. We agree.

Because the jury found the murder occurred within the sight or sound of Lewis's minor children, the State requested that the trial court enter no-contact orders with regards to the three children. In response to the trial court's inquiry, defense counsel replied,

> Your Honor, we understand the State's position. I haven't had a chance to discuss that in any detail with [Lewis], but we understand that the Court will order it. And if [Lewis] wishes to address the Court at some future date about having contact with his children, then he can file a motion.

The trial court ordered no-contact with the three children based on the jury's finding and having heard the evidence.

Pursuant to RCW 9.94A.505(9), a trial court may impose "crime-related prohibitions" as a sentencing condition. In re Pers. Restraint of Rainey, 168 Wn.2d

367, 374, 229 P.3d 686 (2010) (discussing former RCW 9.94A.505(8) (2010)). "A no contact order is a crime-related prohibition." State v. Howard, 182 Wn. App. 91, 101, 328 P.3d 969 (2014). A trial court's imposition of a sentencing condition is reviewed for an abuse of discretion. State v. Torres, 198 Wn. App. 685, 689, 393 P.3d 894 (2017).

Parents have a fundamental constitutional right "to the care, custody, and companionship of their children." State v. DeLeon, 11 Wn. App. 2d 837, 841, 456 P.3d 405 (2020). A sentencing condition that infringes this fundamental constitutional right may be upheld only if the condition is reasonably necessary to accomplish the essential needs of the State and public order, and it is "sensitively imposed." State v. Warren, 165 Wn.2d 17, 32, 195 P.3d 940 (2008). A court can impose a condition that restricts the fundamental right to parent as long as the condition is reasonably necessary to prevent harm to the child. State v. Ancira, 107 Wn. App. 650, 654, 27 P.3d 1246 (2001).

On the record before us, we are unable to review whether the no-contact order was reasonably necessary to accomplish the State's essential needs or was imposed sensitively to the constitutional rights at stake. See State v. Reedy, 26 Wn. App. 2d 379, 394-95, 527 P.3d 156 (2023), review denied, 1 Wn.3d 1029, 534 P.3d 798 (2023). To the extent of our record, the trial court did not acknowledge Lewis's fundamental right to parent or address whether the no-contact order was reasonably necessary to prevent harm to the children. Torres, 198 Wn. App. at 690; Peters, 10 Wn. App. 2d at 584. We do not vacate the no-contact order at this time, but remand for the trial court to consider the essential needs of the State and

public order, the impact of the no-contact order on Lewis's fundamental right to parent, and whether the no-contact order is necessary to protect the children from harm.

In all other respects, the judgment is affirmed.

_Birk, J._

WE CONCUR:

_Díaz, J._

_Bowman, J_